## Myers *v.* The State.

1. Courts are the agencies employed by organized society for the administration of laws designed for the protection of its members in the enjoyment of their rights; and as, by the organic law of the land, no person can be deprived of life, liberty or property except upon the judgment of his peers, it is the duty of the courts scrupulously to guard the right of trial by jury as one of the essential incidents of our judicial system, and one the maintenance of which in its purity and integrity is necessary, not only to the perpetuity of our institutions of government, but likewise to the protection of the liberties of the citizen against the possible encroachments of arbitrary power.

2. Upon the trial of a criminal case, the mind of every person chosen as a juror should at the time of his selection, with respect to the person and the particular matter under investigation, be, as between the State and the accused, in a condition of perfect neutrality; and though upon the *voir dire* they each do qualify as being thus impartial, a verdict of guilty may, nevertheless, be impeached by satisfactory proof that a single juror entered upon the discharge of his duties with a fixed and determined purpose, formed in advance of hearing the evidence, to convict the accused.

3. The existence of mere ephemeral impressions or opinions, either preconceived or produced upon the mind by reading newspaper reports or from hearing rumors and statements under oath or otherwise as to the causes and circumstances attendant upon the commission of a homicide, is not necessarily inconsistent with such a state of mental neutrality as renders one legally competent to sit as a juror; but if such impressions or opinions so far crystallize as to attain in the mind of the juror, in advance of hearing the evidence, that degree of mental conviction upon the question of guilt or innocence,

which would not readily yield to the evidence, then the juror is not impartial in contemplation of law, and is incompetent.

4. The probative effect of affidavits submitted *pro* and *con* upon a motion to set aside a verdict upon the ground of bias and prejudice of a juror is ordinarily a matter for the trial court, and where there is upon such an issue a conflict of the evidence, this court will not usually control the discretion of the judge who tried the cause if he sustain the verdict, even though, as against the affiuavit of a single witness showing prejudice, nothing be offered in reply save only the fact that the juror upon *voir dire* qualified; yet where two witnesses depose with direct circumstantiality to statements and conduct of a person afterwards selected as a juror, made and occurring before the trial, which evince a deliberate purpose upon his part to convict the defendant in the event he should be chosen a juror, and no effort is made to discredit such affidavits, either by a contrary statement of the juror as to the facts stated therein or otherwise (he being at the time accessible), the testimony of such witnesses should be accepted as true, and if supported by evidence that the facts to which they depose were unknown to the accused or his counsel until after verdict, a new trial should be awarded.

5. While every person accused of crime is entitled to a public trial, it is not necessary to its legality that a great multitude should be in attendance, and the presiding judge should not permit the bar or court-room to become so crowded as to impede the progress of the trial by rendering it difficult for the jurors to enter or leave the box, or by preventing the free movement of counsel and witnesses; moreover, the jury should not be in such close and constant contact with the audience as that remarks of bystanders as to the guilt or innocence of the accused, or other indications of public feeling for or against him, may reach their ears or come under their observation. The bar at least should at all times be kept sufficiently open and clear for the prompt and orderly dispatch of the business of the court.

6. It does no violence to the constitutional prohibition against compelling a person accused of crime to give testimony tending in any manner to criminate himself, for an officer to whose custody such a person is committed to take from the person of the accused any article of apparel which may be material as evidence upon his trial; and if such officer, under such circumstances, take the shoes of a prisoner and compare them with certain tracks found near the scene of the alleged homicide, he may testify to the result of his comparison, notwithstanding an objection upon the ground that the evidence was illegally obtained. Where, therefore, under such circumstances,

the trial judge erroneously sustained·a motion to rule out the evidence of the officer, to the effect that he had made such a comparison and giving the result of the same, but omitted to state to the jury that the testimony so ruled out should not be considered by them, such omission affords no ground for the grant of a new trial.

7. The testimony of a witness as to transactions occurring in his absence, based upon information derived from others, is hearsay, and, upon objection made on that ground, should be excluded. Where, therefore, a witness who was a pawnbroker testified that in his absence the accused, under an assumed name, deposited in his shop a certain watch, and it appeared that the witness spoke to that point solely upon information derived from his clerk and from an inspection of his books, together with a certain pawn ticket introduced in evidence, such testimony was but hearsay, and, upon objection, should have been excluded.

8. Though submitted in writing, requests for instructions to the jury based upon theories of the law which, upon no candid view of the pleadings and evidence, are involved in the issues being tried, should be disregarded by the court, and, consequently, their refusal affords no ground for the reversal of a judgment denying a new trial.

9. Confessions of guilt being against the interest of the accused are always admissible, unless improperly obtained, but declarations in his favor are only admissible where, in point of time, their utterance is so nearly contemporaneous with the commission of the alleged offense as to become a part of the *res gestœ.* Where, therefore, it appears that certain statements of the accused were submitted to the jury which embodied both confessions of circumstances tending to establish his guilt and likewise declarations favorable to him, and where it further appears that the inculpatory statements were improperly obtained, and the exculpatory declarations were not so nearly contemporaneous with the commission of the alleged offense as to be a part of the *res gestœ,* it was proper for the court, in its charge to the jury, though neither side so requested, to withdraw from their consideration all the statements in question, including both inculpatory admissions and exculpatory declarations. The court is not bound to submit false issues based upon illegal testimony, though neither party to the controversy objects.

10. The bare fact that a reward has been offered for the apprehension of a person accused of crime, is a circumstance which may be given in evidence as affecting the credibility of any person offered as a witness and sworn upon the trial, who was instrumental in effecting the·arrest, and this without evidence

showing affirmatively how and in what manner the credibility of the witness is affected thereby; and it was, therefore, error for the court to instruct the jury, with reference to the testimony of such a witness, that "the mere fact that the reward was offered is not any evidence against the credibility of the witness—there must be something in connection therewith to show that the witness testified in view of the reward."

11. Whatever is admitted by the trial judge as evidence is entitled to go to the jury for their consideration, to bear such weight and be given such credit as in their judgment it is entitled to receive. Where, therefore, in addition to the parol testimony of the witnesses, written or printed documents or other physical objects are received in evidence as bearing upon the issues made in the case, it is error for the judge to practically withdraw the same from the consideration of the jury by an instruction that they would come to their conclusion from the evidence, and then immediately adding: "The evidence is what the witnesses testify before you from the stand." The verdict should rest upon the entire evidence of every character, whether oral or otherwise.

12. Inasmuch as the questions made in this case, other than as herein ruled, including those relating to the motion to continue, the alleged improper conduct of counsel, and the newly discovered evidence, are not of such a character as that rulings thereon would be of general public utility, and inasmuch as upon another trial the same questions cannot again arise, it is not deemed essential to rule upon the same.

April 29, 1895.

Indictment for murder. Before Judge Clark. Fulton superior court. September term, 1894.

*W. T. Moyers, E. M. & G. F. Mitchell* and *Virgil Jones,* for plaintiff in error. *J. M. Terrell, attorney-general,* and *C. D. Hill, solicitor-general,* contra.

ATKINSON, Justice.

The facts necessary to an understanding of the questions made in this case are as follows:

William J. Myers was indicted in Fulton superior court for the murder of Forrest Crowley. Upon his trial for this offense he was convicted, and thereupon moved for a new trial upon numerous grounds. It will be necessary to the determination of the cause to refer to such only of the

grounds of the motion for a new trial as we now proceed to set forth.

(1) Because the jury which tried him was not a fair and impartial jury, one of the jurors, to wit H. T. Huff, having been an unfair, partial and prejudiced juror, as appears from the affidavits of Benj. F. Yancey, Abner C. Stamps, J. W. King, Cleveland Willcoxon and D. C. Wall; which fact was unknown to defendant or his counsel until after trial, as appears from the affidavits of the defendant and his counsel.

In support of this ground of the motion, the defendant submitted an affidavit from Benj. F. Yancey to the effect, that on the Sunday following the killing of Forrest Crowley in Westwood Park, he went to the scene of the killing with D. C. Wall, who was an engineer on the Central Railroad; that they struck up with Mr. H. T. Huff who was on the grounds in conversation with a doctor, whom the deponent knew by sight, but whose name he did not know; that Huff was discoursing on the killing and news connected with it, and stated that he had heard they had caught Will Myers in Cincinnati; that Huff was very talkative and very bitter and vindictive in his talk and in his manner against Myers; that he pointed to a tree and said Myers ought to be brought back and hung on that tree, so that the whole country could come and see him hanging; that Huff also said that if he were on the jury, he would sit there until judgment day but what Myers would hang; that he was earnest in his manner and very prejudiced against the defendant. Deponent went into the court-house during the trial, and during the progress of the argument and to his great surprise saw Huff sitting as one of the jurors. Deponent was surprised and knew then that Huff was not a fair and impartial juror, and afterwards mentioned the matter to Maj. Willcoxon, of Mynatt & Willcoxon, lawyers, who, he is informed, told the matter to the attorneys for Myers.

Defendant also introduced affidavit of D. C. Wall, who

testified that he was an engineer on the Central Railroad; that he had been such for five years; that he lived at No. 23 Walker street in the city of Atlanta; that on the Sunday following the killing of Forrest Crowley at Westwood Park he went out to the scene of the killing with B. F. Yancey and heard various parties who were there talking; that he did not know H. T. Huff, who was a juror in said case, and did not know whether he was one of the men who expressed themselves as hostile to Myers or not, but that there was considerable talk by several parties, one of whom was with a doctor, or at least he was called a doctor, whose name he did not know; that this man expressed himself in a manner as if he was prejudiced against Myers. He did point to a tree and say something about hanging Myers on it, the exact expression deponent does not now remember. He had never told about this to Myers or any of his family or attorneys until this day.

Also, the affidavit of Abner C. Stamps, who testified that he had lived in the city of Atlanta for the past nine years; that he was a commission merchant; that he knew H. T. Huff, who was a juror in the case of the State v. Will Myers; that shortly after the killing of Forrest Crowley deponent was in Pool's store on Peters street in the city of Atlanta, and heard said Huff say, in speaking of the killing, "If I was on that jury, I would sit fifty years or would break that man Myers' neck." Huff seemed to have considerable feeling in the matter and seemed to be greatly prejudiced against Myers. Deponent was out of the city when Myers' trial was in progress and did not know Huff was on the jury, and for that reason never mentioned these facts before.

Also, the affidavit of J. W. King, who testified that he was a commission merchant, had resided in Atlanta for the past two years; that he had read the affidavit of Abner C. Stamps made in the above stated case, and was present at

v 97·6

the conversation alluded to in that affidavit; that Huff, who was a juror in said case, and who expressed his opinion as testified to by said Stamps, seemed to be very much interested and prejudiced against Myers, the defendant.

In further support of this ground of the motion, the defendant filed the usual affidavits of himself and his counsel, as to their ignorance of the existence of the facts set forth in the affidavits above referred to, until after the conviction of the accused.

(2) Because the court permitted the court-room to be crowded almost to suffocation by an immense crowd of people, the largest crowd that ever gathered in Fulton county court-house, packed like sardines in a box and jammed about the judge's stand, clerk's desk, and on and around the counsel's table and all round and against the jury, and this crowd was greatly prejudiced against defendant; counsel for the defendant, during the closing argument of the solicitor-general, could none of them get seats, and two of them were compelled to sit on top of a table, and in front of them and between them and the jury a crowd of people was packed, while his other counsel was forced to stand in the doorway. A bailiff called the court's attention to the condition of defendant's counsel, and the court said that counsel for defendant could take care of himself. After the jury retired to their room the crowd took possession of the court-room, and made great noise by loud talking and laughter that might easily have been heard by the jury. Each time during the trial that the jury was brought to and from their room, a narrow defile in the surging crowd had to be forced to allow them to pass. Defendant says that the court should have had the crowd kept out of the bar, and reserved it for the persons interested directly in the trial, and out of the court-room, so that only a reasonable number should remain, and that the effect of their being massed around and against the jury was to influence and intimidate them; that the crowd was against the prisoner,

and. communicated their feelings to the jury; and that it was impossible to have a fair trial under the circumstances. As to this ground the court certifies: "I cannot recall that any one sat upon counsel's table, and if so it was not to an extent to interfere with counsel's duties.    I am sure there were no numbers between counsel and jury, and if so it was only for a moment in standing or passing, and not so as to interfere with counsel's proper defense of their client.    It is true that the court-room was crowded, indeed packed, with an audience composed of both sexes, and there was a scarcity of room, but no request was made to me to exclude the audience, which, if made, was impracticable beyond the requirements of room sufficient to conduct the trial, which at all times was sufficient.  Counsel for defendant had the same opportunity of other counsel.    Missing Mr. Moyers during the speaking, I found he was standing in the doorway, and he gave as a reason for his position that he would rather stay there, presumably to me as he could get more air, as at the beginning of the trial he complained of a spell of asthma; and everything possible was done to accommodate his condition, even to the raising or lowering of every sash in the room, which made the room too cool for many in the audience, myself included.    The trial lasted from Monday morning to Friday afternoon, and at the conclusion Mr. Moyers privately thanked me for the consideration I had shown him during the trial.    He was perfectly able to take care of himself in getting admission to the room and to his proper place therein; and if he had applied to me to have room made for him, I would have stopped the case until it was done.    He made the last argument for the defense in a speech of three hours, which was both eloquent and ingenious, and in which he was heard attentively and patiently by the court, the jury, and the audience.    There was no influencing or intimidating the jury by the audience. I kept a bailiff at each end of the jury-box, with instructions to keep the crowd from contact with them at the sides and

in the rear, and which under my supervision was faithfully done, and when they went backward and forward to their room I was careful to first have sufficient space to do so without contact with the audience."

(3) Because when Capt. J. M. Wright, chief of the Atlanta detective force, was on the stand as a witness for the State, he testified that he visited the scene of the tragedy in company with the defendant; that he took defendant's shoes out to the scene of the tragedy and fitted one of them into the tracks. Defendant's counsel immediately objected to the testimony, and the court sent the jury out pending an investigation of the way the shoes were obtained from the defendant. That investigation showed that Capt. Wright had sent the station-house janitor to defendant's cell and got his shoes. The court ruled that the State must prove by the janitor the circumstances under which the shoes were obtained. Defendant's counsel then asked the court to instruct the jury that the answer of the witness that was given before the objection could be made (that the shoe was fitted into the track) was ruled out. The court replied: "Never mind about that now." The jury then returned to the court-room, and Capt. Wright was carried through a minute examination on the subject of tracks, the principal point sought to be made by his testimony being that there were two tracks from the buggy to the dead body and only one leading back to buggy from the body. Captain Wright testified to other tracks in the vicinity but that none came within forty feet of the dead body. Jeff Arnold, the janitor, was shortly afterwards put on the stand, and the jury was sent out by the court. When examined he swore that he went to Myers' cell and told him that the detectives wanted his shoes. Also, that he had just been met at the court-house by some one acting for the State, who said to him, "Did you take them shoes away from him, or did he give them to you?" and the witness said, "He gave them to me," and the man said, "When you get on the stand you say

so, and don't say any more." The court then ruled: "You object to the testimony; I sustain your objection. Our Supreme Court has said that a man cannot be forced to put his foot in a track. There is no evidence of direct force, but the man was certainly imprisoned; so I think better not to complicate the case with it. Let the jury return to the court-room." The jury returned to the court-room. The court did not instruct them that the testimony of Captain Wright, objected to by defendant's counsel, was excluded. Defendant says that the failure of the court so to instruct the jury was error, especially in view of the fact that defendant's counsel had requested it. He says that the jury felt themselves bound to take this evidence; that this evidence was unlawful; that it was evidence that he was compelled to give, and which Captain Wright testified tended to criminate him; that the jury heard defendant's objection to it, and when called back were not told that it was ruled out, and must have presumed that the court had not sustained the objection; defendant claimed that he had never gotten out of the buggy, and the testimony objected to tended to prove that he had gotten out and gone over the hill. As to this ground the court certifies: "My remembrance is, the jury was sent out before Captain Wright had testified anything touching the shoes. As soon as I caught the purpose of the testimony relating to the shoes, I sent the jury out, and hence it was unnecessary to instruct them in that particular, for they had not heard it. As I remember, there was no such request made of the court, in the presence of the jury or otherwise, as contained in this ground."

(4) Because the court permitted N. Kaiser, a pawn-broker, to testify that a watch, sworn to by others as belonging to the deceased, was pawned in his shop by one passing under the name of C. D. Morlein; when it was shown that the witness was out of town when the watch was pawned, and out of town when the detectives got it from his shop, and he could only speak from the record of his shop signed

by said C. D. Morlein, and even then testified that the record showed a different number for the watch pawned by the said Morlein from the watch produced in court as defendant's. Defendant objected to this testimony, because it was irrelevant, was secondary evidence of the contents of the writing and not the best evidence, the writing being accessible; and because it did not show that it was the same watch as Crowley's, and did not show that defendant was C. D. Morlein, or the man that pawned it. As to this ground the court certifies: "The witness testified that his clerk received the watch, but he identified it by the pawn-ticket which was before the jury and for them to pass upon. It was in evidence that defendant confessed pawning the watch at Kaiser's. There was some mistake in one of the many figures on the pawn-ticket, and it was for the jury to judge if it was the same watch pawned from Kaiser's evidence, aided by defendant's admission. The fragments of the letter alluded to in this ground were admitted without objection, and there were no requests in writing to charge upon either of the specifications in this ground."

(5) Other grounds of the motion were, that the court erred in refusing to charge theories of the defendant that, if guilty at all, he was only guilty as principal in the second degree, or as accessory before the fact.

(6) Because the court erred in charging as follows: "There are admissions here in evidence which were obtained upon the saying to this defendant, that it would be better for him if he would tell all about it. It is contrary to law to use admissions obtained that way; hence you must use your discretion in that regard as to what admissions you shall consider legal. There was no motion made before me to exclude the evidence because of its having been obtained improperly, but I deem it my duty to charge you upon the law in reference to that, that no injury in consequence of that shall be done to the defendant. So, as I said before, you must discriminate between those admissions

that were received in that way, and such admissions that were not received in that way and come up to the rule as I have laid it down to you, where there was an absence of hope of benefit, or fear of consequence." Alleged to be error, because defendant did not move to exclude any testimony on the ground that it was an admission made under the representation that it would be better for him to tell all about it; and he alleges the court had no right to instruct the jury to disregard evidence offered against him, which he did not object to. Further, because defendant did not want the evidence excluded, or any doubt cast on its admissibility on the minds of the jury, because he contended that the story or explanation given was the truth; and he alleges he had a right to have the evidence go to the jury of what explanations he made shortly after he was arrested and in charge of the Atlanta police. Further, because the only evidence obtained in the manner set forth in the charge, was the evidence of chief of police A. B. Connolly, who testified that the Chattanooga chief of police had told the defendant to tell all he knew about it because it would be better for him. The only other evidence as to admissions was that of the Cincinnati detective, Meyer, who testified that, offering no inducement to confession, he talked with defendant down in a cell-room, and there, with no witnesses present, defendant told him that he and Brown Allen had made it up, that defendant was to take Crowley out there and meet others, that he did not say what they were to do, but they were to get him out there and "do him." The charge of the court could only have been understood by the jury to mean that they should disregard the explanation given by chief Connolly, which, if true, showed defendant to be innocent, but that they were authorized to believe the Cincinnati detective's story, which stopped short of the explanation given Connolly. It took away from the jury the explanation that defendant's purpose was a mule trade, and left the assertion that his purpose

was "to do him." The statement claimed by the defendant:
to be exculpatory, and which it was alleged the court
illegally excluded from the consideration of the jury by the
charge complained of, was made under the following cir--
cumstances: Several days after the commission of the.
homicide, the chief of police of the city of Atlanta went to.
Chattanooga, Tenn., to meet an officer who had the de--
fendant in custody, the latter having been arrested in Cin-
cinnati, Ohio. The chief of police talked with him at:
police headquarters in Chattanooga. On that occasion the
defendant made a statement to him, it not having been in--
duced by any hope of reward or fear of injury, which state--
ment was as follows: Defendant stated to Mr. Cason and
myself (the chief of police) that there was a man by the
name of Brown Allen connected with it; that Brown Allen.
was the cause of him going to Roswell and bringing young
Crowley to Atlanta. He said further, that he carried young
Crowley out in a buggy to the western portion of the city,
and that they were met by Brown Allen, and that Crowley
got out of the buggy and went with Brown Allen over the
brow of a little hill that was there, and that he came back
and divided the money with him (defendant) that he got.
from Crowley, and gave him the pocketbook and part of the
money, a diamond ring and watch. Defendant said that he
did not get out of the buggy at all. He (Myers) did not get
out of the buggy at all. He said that he had known Brown.
Allen about ten days; he said Brown Allen got in the
buggy with him, and that they drove up to where the street--
car crosses, where the street-car stops, and that Brown Allen:
got out of the buggy. I asked him the question then,.
whether the street-car was there at that time, and he said
there was no street-car in sight, and Brown Allen got out of
the buggy, and that he drove back to Atlanta. I asked him,
when he first said he met Brown Allen, what took place
between them. He says, he met Brown Allen about ten
days before this crime was committed; that he was con-

nected in some way or other with Brown Allen's sister or some female relative of his, and that he got infatuated with her in some way; he met her out at Inman Park, and Brown Allen found him there and they had some words, and that Allen shot at him twice. He said further that Allen made him promise, made him swear, he would not tell anything about this matter. He described Brown Allen as being a medium-sized man, that he sometimes wore a black mustache. He gave us a very indefinite description. He told me nobody that ever saw him with Brown Allen in the city of Atlanta, nor where Brown Allen staid in Atlanta. He said Allen shot at him before the killing. He went with him again. This killing was afterwards. He said that he got the ring as his part of the booty of the murder. He stated to Cason and myself that the ring was in the vest pocket of the old suit, the suit he had on when the murder was committed. I telegraphed Capt. Wright, who was acting chief of police, to get the suit of clothes and try to find the ring. They did not succeed in finding it. He said he had pawned the watch for five dollars and a half, at M. Kaiser's. Detective Ivey got the watch; this is the watch and chain. He said that after Brown Allen had come back from over the hill where he went with Crowley, he kinder slapped him in the face with the red pocketbook and said: "Now you can take this and what money there is in it, and the diamond ring and the watch."

Upon cross-examination, it appeared that the statement was made under such circumstances as would render it inadmissible, upon the idea that it was improperly obtained. It does not appear, however, to have been objected to specially upon this ground. The only other testimony bearing upon this point was the statement of a witness, William Meyer, who testified substantially as stated in the foregoing ground of the motion for a new trial.

(7) Another ground of the motion was as follows: Because the court erred in charging: "An attack is made upon

some of these witnesses who came here from Ohio and Cincinnati, on account of the reward that has been offered in this case. If you believe that there was a reward offered in this case for the detection of the person who committed the crime, and that these witnesses are to get the reward, and that their testimony was affected by that reward, then you could treat them as so swearing; but the mere fact that the reward was offered, is not any evidence against the credibility of the witnesses. There must be something in connection therewith to show that the witnesses testified in view of the reward." Alleged to be error, because it takes away from the jury all right to consider whether the witness is testifying to get the reward which he knows has been offered, unless they can explore the inner conscience of the witness. Defendant alleges that it is the prerogative of the jury to say whether they believe from all the circumstances surrounding the case, the appearance of the witness on the stand, his manner of testifying, his contradictions of his own testimony, his contradiction by other witnesses, his occupation in life, his conduct in the case, and numerous other circumstances shown to the jury, that witness is influenced in his testimony by the reward.

(8) Because the court erred in charging as follows: "As I said, what conclusions you come to will depend upon the evidence that has been submitted to you during the progress of the trial. The evidence is what the witnesses testify before you from the stand." And the court further charged the jury: "There is no witness here who has testified that he saw Myers or anybody else shoot the deceased or otherwise ill-treat him. Hence, if Myers is found guilty or not guilty, will depend upon the circumstances as they are narrated to you by the witnesses." Alleged to be error, because it excluded the jury from the consideration of the prisoner's statement, of the appearance of the pistol, of the appearance of the clothing of Myers and Crowley, of the hotel register, and of the other evidence in the case which

was not purely oral. In this connection, the court further charged: "As I said, what conclusion you come to will depend upon the evidence that has been submitted to you during the progress of the trial. The evidence is what the witnesses testify before you from the stand. You see them, you hear them testify, you see their manner of testifying, you know their relations to the case from the testimony that is introduced; and now if your deduction is from all the evidence that the defendant is guilty, and guilty beyond a reasonable doubt, it would, as I said to you, be your duty to find him guilty; but if you do not believe from all the evidence, and the deduction you make from it, that the defendant is guilty, or you have a reasonable doubt as to his guilt, then likewise, as I said, it would be your duty to find him not guilty." And again, in the same connection, "Hence if Myers is found guilty or not guilty, will depend upon the circumstances that are narrated to you by the witnesses." Alleged to be error, because there was written evidence in the case; there were certain physical objects introduced in evidence, as the clothing of the defendant and the deceased, the shoes of the deceased, the pistol of Myers, and the hotel register; and this charge excluded the consideration of this evidence from the jury, and restricted them to the consideration of the oral evidence.

1. We will first consider, in passing upon this writ, whether a court was lawfully organized which had jurisdiction to try the defendant for his life. If there was not, then no legal judgment of conviction could be pronounced against him. The jurisdiction to try capital felonies is vested by the constitution and laws of this State in the superior courts, and a superior court organized for the final exercise of this supreme attribute of a sovereign power must consist of a judge appointed by law, and a jury organized in accordance with the requirements of the law. When these constituent elements exist, the court is complete. Until then, it is not. If it appear on the face of the

proceeding that any of the primary requisites to the existence of a valid court are wanting, its judgment is void, and may be attacked at any time and anywhere. If it be apparently organized in accordance with law and proceed to judgment, after the time limited for exception to judgments rendered by such tribunals, it will be presumed in favor of its jurisdiction, and that its proceedings were in all respects regular and conformable to law. It is as essential to the rendition of a legal judgment in a case in which a jury trial is required, that the jury and each member of it should be legally competent to sit as a part of the court, as it is that the judge who presides should labor under no legal disability.

The right of trial by jury is sacred wherever the common law prevails, and, though often assailed by persons who little appreciate either its origin or its usefulness in the administration of the law, is an institution so deeply imbedded in the civilization of this country, that so long as our institutions of government continue it will not perish from the earth. It constitutes a part of our judicial system, and courts however organized are but the agencies employed by organized society for the administration of laws designed for the protection of its members in the enjoyment of their rights; and since under our benign system of government no man can be deprived of life, liberty or property, except upon the judgment of his peers, it is the duty of the courts scrupulously to guard the right of trial by jury as one of the essential incidents of our judicial system, and one the maintenance of which in its purity and integrity is necessary not only to the perpetuity of our institutions of government, but likewise to the protection of the liberties of the citizen against the possible encroachments of arbitrary power.

2, 3. This defendant was convicted and is now under sentence of death, and upon the verdict of a jury one member of which he complains was not legally competent to try him. He alleges that before this juror entered upon the

trial of the case, his individual judgment was concluded by what he had heard against the prisoner, and that this juror entered upon the trial of this case corruptly, with a deliberate purpose to bring about his execution. In support of this ground of the motion, he submitted the testimony of witnesses, two of whom deposed that upon one occasion soon after the commission of the homicide, the person afterwards chosen as a juror stated in their presence that the accused ought to be hung, and pointed out a tree upon which the execution should take place. He submitted the testimony of two other witnesses who deposed that, some time after the homicide occurred and after the apprehension of this defendant, this juror stated in their presence, with much earnestness and vehemence, that if he were chosen as a juror upon the trial of the accused, he would sit upon the jury for fifty years or break his neck. The juror, in response to these several affidavits, filed an answer to the first one above referred to only. His answer to this was not a circumstantial denial of the facts stated, but was evasive, and concluded by the statement that upon the trial of the case he was influenced to the judgment finally reached by nothing save the testimony.

The question is, whether upon this state of facts the juror was impartial. Was he impartial in the sense in which that term is employed by the law? Did he speak truthfully when upon the *voir dire* he stated that he had not, from having seen the crime committed or from having heard any of the testimony, formed or expressed an opinion in regard to the guilt or innocence of the prisoner at the bar? Did he speak truthfully when he said he had no bias or prejudice in his mind either for or against the prisoner at the bar? Did he speak truthfully when he said, I am perfectly impartial between the State and the accused? Absolute perfection is not attainable in human affairs. Absolute impartiality or indifference according to the ancient standards is not to be expected, even if it were desired. The

time has long passed in the judicial history of this country when total ignorance of the offense or circumstances connected therewith is made the test of the competency of a juror, but the time will never come when absolute honesty and integrity of the purpose can be dispensed with, either in the jury-box or upon the bench. In olden times the ideal juror, according to Lord Coke, should stand indifferent as he stands unsworn. He should be as white paper, superior to all suspicion of prejudice. He must be *omni exceptione major*. But this cannot mean that each juror shall be absolutely free from all preimpression with regard to the question upon which he is empaneled. To apply such a test, would be to exclude from the jury list of the present day all men who read or who are thrown in association with people who do read. It cannot mean more than that upon the trial of a criminal case the mind of every person chosen as a juror should at the time of his selection, with respect to the person and the particular matter under investigation, be, as between the State and the accused, in a condition of perfect neutrality. He may have a general knowledge derived from newspapers or other sources of all of the facts bearing upon both sides of the question, and if still his mind is in such a state of neutrality as between the respective parties to the issue, there is no reason why he is not a competent juror; and this test applies to each individual juror of the panel. If one of them does not measure up to this standard, and the verdict be objected to in due time upon that ground, it should be vacated and a new trial awarded. As has been said before, the juror must stand indifferent. His mind should be in a state of neutrality, as respects the person and the matter to be tried; there should exist no bias for or against either party in the mind of the juror calculated to operate upon his mind. He should come to the trial uncommitted and prepared to weigh the evidence in impartial scales. For if he be not thus indifferent, but come to the trial with a preconceived opinion of the guilt or innocence

of the prisoner, it is adjudged that he is disqualified, upon the theory that such a prepossession of the mind is inconsistent with the exercise by the juror of a free and impartial judgment of the case upon the evidence; and the declaration of the juror that he believes he could decide the case uninfluenced by his previous opinion will not remove the objection, for the reason, as assigned by Chief Justice Marshall (1 Burr's Trial, 416), that "the law will not trust him." Well considered opinions pertinent to this subject may be found in 74 N. Y. 285; 7 Texas Appeals, 519.

The disqualifying bias or opinion must be such as affects the neutrality of the juror's mind. The existence of mere ephemeral impressions or opinions, either preconceived or produced upon the mind by reading newspaper reports or from hearing rumors and statements under oath or otherwise as to the causes and circumstances attendant upon the commission of a homicide, is not necessarily inconsistent with such a state of mental neutrality as renders one legally competent to sit as a juror. Such impressions cannot properly be classed as opinions at all. By some kind of subtle influence, impressions of this character are unconsciously made upon the minds of those persons who are the most deliberate in reaching conclusions or in forming opinions, and so long as these impressions remain in this nebulous state, they cannot be classed as disqualifying opinions; but whenever they so far crystallize upon the mind of the individual upon whom they are made that, in advance of hearing the evidence, they attain the dignity of mental convictions, however slight they may be, upon the question of guilt or innocence, then the juror is not impartial in contemplation of law, and is incompetent. If they be such only as would readily yield to the evidence, they are impressions merely and not crystallized opinions. Upon the general subject of disqualifying opinions, see Thompson on Trials, vol. 1, §79, and cases there cited.

4. We come now to deal with the question as to whether

the evidence was sufficient to establish the alleged disquali-
fication of the juror. In determining this question, it is
necessary to look to the probative value of the affidavits
introduced upon the hearing and which bear upon this
point. The rule that proof by a single witness of the
formation and expression of an opinion by a juror against
the defendant will not be sufficient to impeach the verdict,
the juror himself having previously denied the fact on oath
in his examination before the trial, was first recognized and
established by this court in the case of *Epps* v. *The State,*
19 *Ga.* 102. Since then the doctrine of that case upon this
point has been steadily adhered to (see *Hudgins* v. *State,*
61 *Ga.* 185; *Fogarty* v. *The State,* 80 *Ga.* 464, and the
cases there cited), until it has now become established as
one of the fixed rules of procedure of force in the courts of
this State; and it rests on the theory that the oath of the
juror, in response to the affidavit thus filed, or the oath of
the juror in response to the questions propounded on the
*voir dire* in which he qualifies himself, being opposed to
that of the witness against him, it is a case of oath against
oath, and the presumption in favor of the verdict is suffi-
cient to turn the scale, or at least to sustain the exercise of a
discretion by the presiding judge in upholding the verdict.
Ordinarily, the question as to whether or not a verdict is
sufficiently impeached by showing the disqualification of a
juror is a question where, upon a conflict of evidence, the
discretion of the presiding judge should prevail, unless the
weight of the evidence be so overwhelming against the find-
ing of the circuit judge upon that point as that it can be
fairly stated that he did not properly exercise the discretion
vested in him by law.

Measured by this test, we are fully persuaded that in the
present case the verdict should have been set aside. Four
witnesses deposed to the expression of opinions on two occa-
sions, the expressions upon each of which occasions would
have disqualified the juror. They deposed upon each

occasion to the language and manner of the juror, to time and place and the persons who were present, with direct circumstantiality, so that if what was deposed by them was not true, its falsity could have been easily established.  To one of the affidavits made touching what transpired very soon after the homicide, the juror made an answer.  As will be seen from reading it, the answer was not a direct circumstantial denial of the improper conduct attributed to him, but it was evasive, referred to minor inaccuracies in the affidavit, and did not deny in terms the main controlling fact that he had formed and expressed an opinion prejudicial to the defendant upon whose trial he was afterwards selected as a juror.  Touching this transaction, the juror having answered that when he tried the case he reached his conclusion from the evidence and not from these previous impressions, and the expressions themselves having been uttered so soon after the commission of the homicide that they might have been fairly attributable to excitement and not to deliberate operations of the mind, there might have been such a conflict as that the circuit judge would have been authorized, though by no means required, to uphold the verdict. But touching the transactions to which the other witnesses deposed, there is nothing opposed to the sworn statements of the impeaching witnesses, save only the response of the juror to the questions propounded on the *voir dire*.  These witnesses testified that some time after the commission of the homicide and the apprehension of the accused, when cooling time was supposed to have elapsed, when the heat and fever of the public mind, generated by the atrocity of the crime committed, had had time in some sense to have abated, this juror, in a vehement manner, earnest and apparently sincere, as though he meant what he said, expressed the deliberate purpose, in the event he was selected on the jury, to break the neck of the accused if he had to sit there fifty years.  No witness denied the

truth of this statement, not even the juror himself, though
he was accessible to the court and had ample opportunity to
do so; and yet, in the face of this testimony, the courts are
asked to sustain a verdict returned by a jury of which such
an individual was a member. It is impossible for us to
conceive how an upright and intelligent man, such only as
are entitled to sit upon a jury, could deliberately and in
cold blood lie in wait and avail himself of an opportunity
to sit upon the jury for the purpose of convicting any man
of any offense, however guilty or innocent, and thus pollute
the very source from which the pure stream of justice is
supposed to flow. We cannot, under our oaths, uphold
such a verdict; and can excuse such an offense against
society and against the public justice only upon the chari-
table supposition that the man thus chosen was too densely
ignorant to understand or appreciate the nature of an oath,
or his obligation to himself, to society, to his God. His
very presence upon and participation in the deliberations of
the jury is supposed in law to have inoculated the entire
panel with the virus of his prejudice, and to have rendered
the return of a legal verdict impossible. The law guarantees
to every man, whether guilty or not, a legal trial, and when
the State, in the exercise of its sovereign power, placed the
accused on trial for his life, it guaranteed to him that no
person should participate in his trial who was under such a
disability as rendered it impossible for him to be acquitted.
To permit this verdict to stand would be equivalent to per-
mitting the State to say, you are charged with the commis-
sion of an offense; you are to be tried for your life; if con-
victed, you will be executed; you cannot be acquitted.
What a mockery is such a judicial trial! To its result we
cannot give our assent; and accordingly direct, not that the
defendant be retried, but that he be tried.

5. Upon the question of practice covered by the prop-
osition announced in the fifth head-note, we do not deem
it necessary to declare further than is therein stated, save

only that such matters appertain largely to what has been aptly termed the police power of the circuit judge. If the crowds which assemble to witness the trial of any cause are so large as by their conduct to interfere with the due administration of the law, or to interfere with the parties, counsel and jurors who are engaged in the trial of the case, the court should adopt proper measures of repression; and the trial is not the less public, within the meaning of that term as employed by the constitution, that some persons are necessarily excluded from the court-room for the want of seating capacity. These matters are necessarily to a great extent in the discretion of the circuit judge, but a proper exercise of this discretion would relieve both court and counsel of much embarrassment in the trial of causes, and tend largely to promote the due administration of the public justice.

6. Upon the trial a police officer was introduced, and testified that he had taken a pair of shoes which belonged to the defendant (whether they were taken from his feet and whether with or without his consent does not appear), and compared them with certain tracks which appeared at the scene of the homicide. He testified to a similarity of such tracks. At this point objection was made to the competency of this testimony, and pending the argument of this objection the jury was removed from the court-room. The court ruled that the testimony was not legally competent, but when the jury returned he omitted to instruct them that they were not authorized to consider the testimony, and counsel assigns as error the failure of the court so to instruct the jury. We do not think this omission was error, for the reason that the court erred in ruling the testimony inadmissible. Under authority of *Franklin* v. *The State*, 69 *Ga.* 36, and the cases cited in support of the text of the opinion of the court, which appears on page 43, the testimony offered was legally competent and ought to have been admitted. It was the duty of the officer to have taken from

the possession of the defendant any article which he might have had that would throw any light upon the circumstances of his guilt or innocence, and preserve it for use at the trial. As was truly said by Chief Justice Jackson in the case cited, it was what the accused wore that witnessed against him, and not any act that he did under coercion. He was not forced to make any track or to put his foot into any track. The officer simply took from him the article in his possession which afterwards testified against him. If the testimony then was legal and ought to have been admitted, there certainly can be no error in the omission of the court to formally withdraw it from the consideration of the jury. The error first committed by him was cured by his subsequent action. The latter action was simply, in effect, the reversal of an improper ruling. So that ultimately, with respect to the matter complained of, the proper and legal conclusion was reached.

7. It will be seen from reading the testimony of the witness M. Kaiser, which appears in the ground of the motion hereinbefore set out, that his testimony was based upon information solely derived from others and from an inspection of books and papers, the verity of which he could not by personal knowledge possibly avouch. His testimony was hearsay and should have been excluded.

8. We do not deem it necessary to deal with the various requests to charge other than as indicated in the eighth head-note.

9. In the present case, it appears from the record that certain confessions made by the accused were introduced in evidence and without objection, though it appears that the circumstances under which they were made would, if objected to, have rendered them legally inadmissible. The alleged confessions contained a narrative of certain exculpatory as well as inculpatory facts. It appears that the statements contained in such confessions were made several days after the commission of the homicide. The court charged

the jury upon the subject of confessions, and that the jury would not have a right to consider them in reaching a verdict. This charge was objected to upon the ground, that inasmuch as the entire confession was before the jury without objection, the accused was entitled to have the benefit of the exculpatory statements contained therein, he being willing to abide the consequences of having the improperly obtained inculpatory statements considered against him. He assigns error upon this action of the court.

We think the court took the proper view of the transaction. A man should neither be convicted nor acquitted upon improper testimony. The inculpatory statements were not admissible as evidence, and if objected to at any time by the accused, the court should have excluded them; and he was justified, in the interest of public justice, in finally withdrawing by his charge such statements from the consideration of the jury. The accused was not entitled to have any exculpatory declarations made by him to go to the jury, they not being a part of a confession which could be legally considered by the jury. Of course, if a confession is made under such circumstances as would authorize its admission, the entire confession, including any exculpatory statements which may be connected with it, should be considered. But where none of it is legal, none of it should go to the jury for their consideration. The exculpatory statements made by the accused were declarations in his own favor. It is obvious that declarations made by the accused after the commission of the offense could never be admitted in his favor, unless they be so intimately and closely associated with the perpetration of the offense as to take on the dignity and character of *res gestae.* The length of time which elapsed between the commission of the homicide and the utterance of the declaration was so great as to utterly exclude their acceptance as a part of the *res gestae.* For that reason, the circuit judge pursued the

only proper course when, of his own motion, he withdrew from the consideration of the jury the entire statement.

10. It appears from the record that a reward had been offered for the apprehension of the accused. The fact that this reward had been offered had been widely advertised by the police officers of the city of Atlanta. The accused was apprehended by officers in a distant city, and they were brought here to testify against him. Upon the trial of the case, they being introduced as witnesses, the judge charged, amongst other things, as follows: "The mere fact that a reward was offered is not any evidence against the credit of the witnesses. There must be something in connection therewith to show that the witnesses testified in view of the reward."

We think this charge was error. The fact that a reward had been offered for the apprehension and conviction of the accused, standing isolated and alone, is a circumstance which goes to the credit of any witness, who being interested in the apprehension and conviction of the prisoner, might have an interest in the reward. Whether or not he testified with a view to the reward, is another circumstance which may be proven to affect his credit. The weight and effect of the circumstance first above referred to may be completely destroyed by showing that the witness did not testify with a view to the reward or did not know of the existence of the reward, but as to whether the one circumstance is overcome by proof of the other, is at least a question for the jury, and therefore it was error to charge the jury that the mere circumstance that a reward had been offered was not *any* evidence to be considered by the jury. However slight might have been its bearing on the case, it was competent, and ought not by this instruction to have been withdrawn from the consideration of the jury.

11. In the present case, in addition to the parol testimony of the witnesses introduced for the parties, there were certain printed documents and other physical objects intro-

duced in evidence. The court, after instructing the jury that they would come to their conclusion from the evidence, immediately stated to them: "The evidence is what the witnesses testify before you from the stand." We think, upon authority of *McLean* v. *Clark*, 47 *Ga.* 24, and *Bowden* v. *Achor*, 95 *Ga.* 245–62, this instruction was erroneous. The omission of the circuit judge to refer to the evidence other than that to which the witnesses testified from the stand was doubtless wholly inadvertent, but the verdict should rest upon the entire evidence, of every character, whether oral or otherwise, and the court, in delivering its charge, should guard against such instruction as would withdraw from the consideration of the jury any evidence they were entitled to consider upon the trial of the cause.

12. There are a number of other questions made in the record, including a motion to continue, alleged improper conduct of counsel, and newly discovered evidence; but all of them are of such character as that rulings thereon would not likely serve any purpose which would be of general utility to the public, and inasmuch as they cannot arise again, we will refrain from discussing them.

Inasmuch as, under the view we take of this case, the accused has not been tried according to law, whether under the evidence he be guilty or not, we are constrained to reverse the judgment denying him a new trial.

*Judgment reversed.*