UNITED STATES, Appellee

v

JOHNNIE L. BROWN, Sergeant, U. S. Army, Appellant

7 USCMA 251, 22 CMR 41

252

253

James H. Keet, Esq., argued the cause for Appellant, Accused. With him on the brief were Major Edwin Doran and First Lieutenant Bert M. Gross.

First Lieutenant Lewis W. Evans argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Thomas J. Newton and First Lieutenant James G. Duffy.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Following trial by general court-martial, the accused was found guilty of communicating obscene language over the telephone and wrongfully communicating a threat, both offenses in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures, and confinement for six months. Intermediate appellate agencies have affirmed, and we granted review to consider three issues which will be identified as each is discussed.

At about 5:15 p.m. on July 19, 1955, a female telephone switchboard operator at Fort Leonard Wood, Missouri, was the recipient of an unsolicited obscene telephonic proposal. The voice seemed to be that of a male person and the call was made from a local telephone. Both the military police and the operator's supervisor were immediately notified, and when the same man called again the female supervisor enticed him to continue calling back. Meanwhile, Sergeants Kuntz and Hamer, who were Criminal Investigation Detachment agents, proceeded to the building where the telephone from which the offensive call had been made was located and entered to find the accused using the phone. Sergeant Kuntz seized the telephone, ascertained that the switchboard supervisor was the person to whom he was speaking, and then asked the accused to speak a few words into the mouthpiece. The accused finally did so, albeit reluctantly, and the supervisor

identified his voice as that of the offender.

After a good deal of persuasion the accused agreed to accompany Kuntz and Hamer to another building for interrogation. While en route the accused threatened retaliation against Sergeant Hamer for his part in the accused's apprehension.

## II

We are met at the outset with an issue of fundamental importance which is properly before us for the first time. Prior to the convening of the court-martial the convening authority directed that the courtroom be closed to the public, but informed defense counsel that the accused could have anyone present that he wished. At the trial defense counsel objected to the order on the basis that he was entitled to have present the public at large. The law officer heard arguments on the objection and then ruled that because of the nature of the testimony the convening authority had good cause for closing the courtroom to spectators. It is now urged by appellate defense counsel that the right to a public trial is part of military due process and that denial of this right was, per se, prejudicially erroneous.

In order to present fairly the extent of the order of exclusion we quote relevant portions of the record:

"DEFENSE: Before proceeding, I would like to ask the trial counsel

254

and the president of the court whether my impression that this court has been closed to the public is correct?

"PRESIDENT: It is correct.

"PROSECUTION: I have been so instructed.

"DEFENSE: I can readily understand the convening authority's desire to spare the telephone operators in this case embarrassment, and I think that is indeed worthy; however, I do feel an accused, in criminal proceedings including a military trial, is entitled to a public trial, and so I would like the record to indicate my exception to the closing of this court to the public.

. . . . . .

"LAW OFFICER: The Manual for Courts-Martial provides that ordinarily General Court-Martial trial will be open to the public; however, for reasons of security, and other good cause, the convening authority may direct that the public be excluded.

"It is considered that the convening authority in this case had good cause for ordering the court to be closed to spectators.

"The objection of the defense, therefore, is overruled.

. . . . .

"DEFENSE: . . . In all fairness, and for the record, the convening authority authority [sic] agreed if the accused wished any particular person to attend, their presence could be properly arranged for. My objection goes only to the public at large."

For reasons of military necessity the trial of certain cases in the armed services may require the exclusion of the public, but we are presently dealing with a charge which alleges no more than the use of vile and obscene language—an offense which is by no means limited to the military community—and thus there is no necessity for departing from the rules applicable to civilian offenses. For that reason we will develop both the civilian and military rule.

The right to a public trial has long been recognized as one of the more valuable rights inuring to the individual in a free society, and with good reason, for adherence to this principle serves to bring about a good many desirable ends. Professor Wigmore, in his learned treatise (Wigmore, Evidence, 3d ed, § 1834) has aptly summarized the attractions of a public criminal trial, as follows:

". . . [(1) It tends] to *improve the quality of testimony* . . . [for] it produces in the witness' mind a disinclination to falsify; first, by stimulating the instinctive responsibility to public opinion, symbolized in the audience, . . . and next, by inducing the fear of exposure of subsequent falsities through disclosure by informed persons who may chance to be present or to hear of the testimony from others present. Objectively, it secures the presence of those who by possibility may be able to furnish testimony in chief or to contradict falsifiers and yet may not have been known before hand to the parties to possess any information.

. . . . . .

"[(2)] . . . a wholesome effect is produced . . . upon all the officers of the court, in particular, upon judge, jury, and counsel. In acting under the public gaze, they are more strongly moved to a strict conscientiousness in the performance of duty. In all experience, secret tribunals have exhibited abuses which have been wanting in courts whose procedure was public.

. . . . . .

"[(3)] The educative effect of public attendance is a material advantage. Not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy."

While the precise origin of the right to a public trial has been lost in the mist of passing time, there is clear evidence that it is part of our common law

heritage. Legal writers from ancient times have mentioned it as the prevailing practice, and regarded it as one of the desirable attributes distinguishing common law trials from civil law systems. Smith, De Republica Anglorum (1565), Book 2, Chapter 15, Alston ed, page 79; Hale, History of the Common Law of England, (about 1670), Chapter XII, Runnington's ed, page 343. In any event, we are sure that the ends served by a public trial are as important today as they ever have been, and that they offer the best possible climate in which to reach the real truth of any matter in dispute.

Within the Federal system the right to a public trial is secured by the Sixth Amendment to the Constitution of the United States, which provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

The right has been similarly guaranteed by the constitution of nearly all the states, and thus it has received almost universal recognition in this country. Parenthetically it is to be noted, however, that the United States Supreme Court, in Re Oliver, 333 US 257, 68 S Ct 499, 92 L ed 682 (1948), observed that: "Counsel have not cited and we have been unable to find a single instance of a criminal trial conducted in camera in any federal, state or municipal court during the history of this country"; but then recognized, by way of footnote, that cases within the jurisdiction of courts-martial may be regarded as an exception.

The civilian courts have recognized that the right is subject to certain limitations and exceptions. Spectators having no immediate concern with the trial need not be admitted in such numbers as to overcrowd the courtroom or displace space needed for those who do have special concern with the trial, such as court officers, jurors, and the relatives and friends of the accused. Davis v United States, 247 Fed 394 (CA 8th Cir) (1917); Myers v State, 97 Ga 76, 25 SE 252 (1895). Anyone whose conduct interferes in any way with the administration of justice may be removed. United States v Buck, Fed Cas No 14,680 (E D Pa) (1860); State v Scruggs, 165 La 842, 116 So 206 (1928). Where a child is a witness and cannot testify coherently before an audience, it is permissible for the court temporarily to exclude the public in order that competent testimony may be obtained. Hogan v State, 191 Ark 437, 86 SW2d 931 (1935). Youthful spectators may be excluded in cases where the evidence is likely to involve the recital of scandalous or indecent matters which would have demoralizing effect on immature minds. United States v Kobli, 172 F2d 919 (CA3d Cir) (1949); Tilton v State, 5 Ga App 59, 62 SE 651 (1908). Thus far the courts are in accord.

On the other side of the ledger may be found the principle that no accused can be tried, convicted, and sent to jail when everyone except the judge and his attaches are denied entrance to the court. Radin, The Right to a Public Trial, 6 Temple LQ 381. "And without exception all courts have held that an accused is at the very least entitled to have his friends, relatives, and counsel present, no matter with what offense he may be charged." Re Oliver, supra. Pretermitting at this point any discussion concerning the right of the press to be present, this view apparently represents the maximum impingement on the right which can be imposed in civilian tribunals, although it should be noted that the Supreme Court has never been squarely faced with a case where public disclosure of the evidence would seriously endanger this nation's security. It is in the area marked out by these principles that courts differ and difficult problems arise.

Turning to military law, we first

note that it has long been the view of an eminent military author that the Sixth Amendment is not itself directly applicable to trials by court-martial. Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, footnote 38, page 165, footnote 27, page 287. And the Supreme Court seemed to express the same view in Ex Parte Quirin, 317 US 1, 43, 63 S Ct 1, 87 L ed 3 (1942), saying that in cases tried by general court-martial, presentments or indictments by a Grand Jury are not required nor is public trial by jury guaranteed. However that may be, Congress did not envision—and judicial conscience would not permit—a retreat to the ancient view that courts-martial have an absolute right to close their doors to the public whenever they choose to do so. See Winthrop's Military Law and Precedents, supra, page 161. Certainly this must be true if the concepts which we have elsewhere referred to as "military due process" are to have any real content, see United States v Clay, 1 USCMA 74, 1 CMR 74, for the right at stake is too fundamental to depend upon the whim of those in charge of military judicial process. Although both the Code and its legislative history are silent concerning the matter of public trial, the present Manual is not, and we focus our attention on it to assist in resolving our problem.

The manual for Courts-Martial, United States, 1951, paragraph 53e, page 74, provides:

"As a general rule, the public shall be permitted to attend open sessions of courts-martial. Unless otherwise limited by departmental regulations, however, the convening authority or the court may, for security or other good reasons, direct that the public be excluded from a trial. When practicable, notices of the time and place of sessions of courts-martial will be published so that persons subject to the code may be afforded opportunity to attend as spectators provided attendance does not interfere with the performance of their duties. See also 118 (Contempts)."

Apparently, the Manual draftsmen clearly intended to frame the language of the Manual so as to permit exclusion of the public generally when the testimony was revolting or obscene, and to bar the doors to avoid "the moral harm of satisfying pruriency in trials of certain crimes," for they expressed such a view in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, by saying (page 59):

". . . Sessions of courts-martial, however, will be open to the public unless security requirements, presentation of obscene matter, or other good reason exists, in which case the convening authority or the court may direct that the public be excluded."

Of course, we are not concerned with any security question in the present instance, but if the remaining parts of the Manual provision are to be upheld, they must be restricted to narrow limits. By that we mean to suggest that the word "public" must not be taken to include all spectators or classes of spectators. United States v Zimmerman, 19 CMR 806. Similarly, an order of the convening authority or law officer excluding everyone save the parties and their counsel, court personnel, representatives of the press, and the accused's relatives should be viewed as binding the accused too tightly. United States v Tanksley, 145 F2d 58 (CA 9th Cir) (1944). And an order excluding all spectators except those having a connection with the case goes too far. United States v Kobli, supra. While the full extent of the order issued in this case is not clearly delineated, we believe it was so broad as to require us to hold that the accused was denied his right to a public trial. If a convening authority or a law officer has some discretion—and clearly they do—then we must assess this particular order to determine if it was so all-inclusive as to amount to an abuse of discretion.

So far as we are able to ascertain, it barred the entrance to everyone except those whom the accused might desire to nominate. That is too broad

unless the option given to accused would open the door sufficiently to save the right. It may well be that under some circumstances a burden can be shifted to the accused to designate those who may remain, but to place that load on his shoulders when this type of offense is alleged clearly goes beyond the bounds of necessity. One of the basic reasons for insisting that the public be admitted is to raise the possibility that false witness testimony will be exposed through disclosure by informed persons who may chance to be present. In all probability, the accused would be unable to identify those persons who might possess information unbeknown to the parties, and so to require him to designate merely grants him a privilege without substance. A similar condition was imposed on the defendant in the case of United States v Kobli, supra, and the United States Court of Appeals answered the Government's assertion that it was reasonable in the following language:

". . . But in making his order applicable to the public generally he passed the bounds laid down by the Sixth Amendment and thus denied the defendant the public trial to which she was entitled. This was not cured by his subsequent offer to re-admit such persons as the defendant might request since the offer was limited to persons whom the defendant might designate and who were connected with the case."

Assuming without deciding that the offer by the judge in that instance was more narrow than the one advanced by the convening authority in this action, in that the choice there was limited to persons connected with the case, the underlying concept is abridged in both rulings.

In view of the trend of modern authorities, we feel constrained at this point to mention our belief ▆▆▆▆▆▆▆ that in military law, unless classified information must be elicited, the right to a public trial includes the right of representatives of the press to be in attendance. In the recent case of People v Jelke, the Court of Appeals of New York, 308 NY 56, 123 NE2d 769, had this to say:

"Due regard for defendant's right to a public trial demanded, at the very least—certainly, lacking valid legislative sanction—that he be not deprived of the possible benefits of attendance by the press. See Keddington v State, 19 Ariz 457, 459, 172 P 273, LRA1918D, 1093; see, also, Radin, op. cit. pp. 391, 394; Note, 35 Mich L Rev 474, 479. Its widespread reporting of what goes on in the courts may well prove a potent force in restraining 'possible abuse of judicial power.' Matter of Oliver, supra, 333 US 257, 270, 68 S Ct 499, 506. That being so, justification for excluding the press in this case may not be found in the sensational and vulgar coverage which the proceedings may have been receiving in some newspapers and which evidently disturbed the trial judge. Deplore as we may the bad taste of reporting of that kind, the courts may not take unto themselves the power to enforce their notions of public decency and morality at the sacrifice of basic rights guaranteed to the defendant by statute. The task of balancing the several competing interests and considerations must in this instance be left to the legislature, fully competent as it is to qualify or limit the rights granted by it, so long as the requirements of due process are not offended. See Commonwealth v Blondin, supra, 324 Mass 564, 570–572, 87 NE2d 455."

Winthrop in his Military Law and Precedents, 2d ed, 1920 Reprint, page 162, quotes the early practice to be as follows:

". . . So, if it is determined by the court, as it may be, that its proceedings shall not be reported except officially, newspaper and other reporters may be required not to take notes, under penalty of exclusion if they attempt it. In general, however, such reporters are freely admitted, and sometimes even special accomodation is provided for them."

Undoubtedly the early rule could be applied by military courts if matters of national security were involved, but we pass that question for presently it

is irrelevant. However, when the issue is simply one of indecent language involving adult witnesses, we conclude the right to a public trial encompasses the privilege to have the press in attendance. Accordingly, military courts should no longer be closed to all merely because immorality may be involved.

Had the order here specifically exempted representatives of the press from the exclusion order, or had the accused requested the presence of reporters and had his request been granted, error would not be so apparent. However, the record is silent as to how extensive the coverage was intended to be, and so we must interpret an order which bars the public as including all segments thereof, including reporters. Given that interpretation it follows that both the convening authority's order and the law officer's ruling were improper and erroneous.

When we pause to balance the right of the accused against the right of witnesses to be spared undue embarrassment, we can find no justifiable reason to support the denial of a public trial. The female witnesses in this case were fully matured women who no doubt had had some contact with salacious language. It is true that if the prosecution hoped to prove the material allegations in this case, the witnesses were going to be required to repeat the indecent language which the accused communicated to them. To give voice to such language before an unrestricted audience would have been a source of embarrassment to the victims, but the very presence of the officers who manned the court no doubt had substantially the same effect. It must not be forgotten that the accused is presumed innocent, and if he is not guilty his acts would not be the proximate cause of humiliation. Undeniably there is a certain amount of mortification imposed on victim-witnesses in sex cases, but that is a condition which cannot be eliminated from our judicial system. To lessen it would be desirable, but not at the expense of a public trial. Therefore, although the exclusionary order was made to improve the courtroom atmosphere for the witnesses, it so impinged on the right to a public trial that it denied the accused what we view as military due process of law. We, therefore, hold that the accused's first assignment of error must be sustained.

## III

Because the next two issues may arise if the case is retried, we move on to dispose of them. We realize that different facts may be presented upon rehearing, and a different result brought about, but those changes cannot be anticipated, and we must take the record as we now find it. Defense Exhibit "A" for identification consists of notes taken by the assistant defense counsel during the course of an interview with Sergeant Kuntz. At the close of the interview, the sergeant had an opportunity to read the notes and then signed them. Thereafter, he conferred with trial counsel, returned to the assistant defense counsel's office, scratched out his signature, and wrote a statement at the bottom of the notes to the effect that the notes were not his statement and did not accurately represent the facts as he had related them to defense counsel. At trial, Sergeant Kuntz admitted on cross-examination that he had made a prior inconsistent statement to the assistant defense counsel, and that the statement was included in defense counsel's notes. When defense counsel offered the notes of his interview with Sergeant Kuntz as an exhibit for impeachment purposes, the law officer refused to admit them. Although accused now asserts that this ruling was erroneous, we cannot agree.

The proper rule governing this point may be found in paragraph 153*b* of the present Manual, which deals with prior inconsistent statements and provides: "If the witness admits making the inconsistent statement, no other proof that he made it is admissible." Here the prior inconsistency which was at issue was brought before the court and the witness admitted both that he had made it and that it was true when made. Therefore, no other proof of the inconsistency was proper, and the law officer's ruling was correct.

## IV

It was earlier mentioned during the statement of facts that at the time the accused was apprehended he was asked by Sergeant Kuntz to speak over the telephone so as to permit the telephone supervisor to identify his voice. Although the accused did not willingly co-operate he eventually complied, and his compliance was not induced by threats, unlawful inducement or affirmative acts of coercion. It is now contended that this evidence of voice identification was inadmissible, in that the accused was compelled to incriminate himself, in violation of Article 31 of the Code, 50 USC § 602.

In United States v Greer, 3 USCMA 576, 13 CMR 132, we held that to compel an accused to submit to a voice identification test is a violation of the privilege against self-incrimination and that such evidence is, therefore, inadmissible. Furthermore, consent given in the face of an order from a superior may as easily be viewed as coerced as in the case of "consent" to a search and seizure. See United States v Berry, 6 USCMA 609, 20 CMR 325. However, this record fails to show that accused was cowed by the fact that one of his apprehenders was a superior noncommissioned officer or because they were officials of the military police system. He was no newcomer to the service, being a sergeant with over eight years' experience in military police work. At all times he showed an awareness of his rights, and indeed, vehemently insisted, at the time of apprehension, that he knew them and intended to rely upon them. Under these circumstances we simply have no cause to conclude that the evidence of voice identification was the product of coercion arising out of the relative rank or assignment of the participants.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for disposition. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (concurring in the result):

I agree generally with the discussion in the principal opinion on the right to a public trial. I think it important to emphasize again, however, that, in my opinion, persons serving in the armed forces of our country are entitled to all the rights and privileges accorded to civilians, except the right to an indictment by a grand jury, which is expressly excluded by the Constitution itself, and trial by jury, which is excluded by necessary implication. See my dissenting opinion in United States v Sutton, 3 USCMA 220, 228, 11 CMR 220.

Moreover, in my opinion, Ex Parte Quirin, 317 US 1, 42, 63 S Ct 1, 87 L ed 3 (1942), does not, as the majority imply, indicate that the right to a *public* trial by jury" is not required in a court-martial. The Quirin case does not discuss the right to a public trial; it is merely concerned with the right to a trial by petit jury.

Additionally, it is appropriate to point out that if a rehearing is ordered, the question of the admissibility of the voice identification can be inquired into *de novo*. In other words, our present holding is based upon the evidence in the record of trial before us, and it is not intended to circumscribe either the parties or the law officer at the rehearing.