Syllabus.

# Richmond.

Doyle v. Commonwealth.

March 12, 1902.

1. Jurors—*Disqualification—Relationship.*—A juror is not disqualified from service in a criminal case simply because an uncle of the juror is remotely connected by marriage with kindred of the prosecutrix.

2. Jurors—*Incompetency—Waiver—Objection After Verdict.*—A verdict will not be set aside on account of the incompetency of a juror, where the incompetency was disclosed on the *voir dire,* and an objection on that account was sustained, but was afterwards with-drawn by the prisoner. He cannot take his chances of a favorable verdict, and afterwards object.

3. Trial—*Order in Court-Room—Effect of Disorder—Discretion of Trial Court—Case at Bar.*—Much must be left to the judgment and discretion of the trial court in the preservation of order in the court-room and in the exclusion of extraneous influences on the trial of a criminal case. Applause in the court-room and other manifestations of approval or dislike should be promptly suppressed, and if the trial court fails to exercise its discretion with becoming vigor, or the public becomes so violently excited as to overawe the jury, and ground is afforded for the belief that justice has not been done, the appellate court should set aside the verdict and award a new trial. In the case at bar, the trial judge promptly rebuked applause while a witness for the Commonwealth was testifying, and threatened to clear the court-room. When the offence was repeated the judge again threatened to clear the court-room, and placed policemen in the rear of the court-room to prevent its recurrence and to detect offenders. The offence not being again repeated, this was deemed sufficient.

4. Criminal Law—*Excessive Fines.*—Under the evidence in this case a fine of $1,000 for an indecent assault upon a young lady cannot be said to be so excessive as to be prohibited by the Constitution, nor

to manifest bias or prejudice on the part of the jury. The mere
fact that the fine is double the maximum allowed in certain felonies
is no evidence of excess in a case like this, where the Legislature
has interposed no statutory limitation on the amount.

5. NEW TRIAL—*Conflicting Evidence—Province of Jury*.—The jury are the
judges of the credibility of witnesses examined before them, and
their verdict is final on that subject. A court has no power to
grant a new trial unless the verdict is against the law, or is con-
trary to the evidence, or is without evidence to support it.

Error to a judgment of the Corporation Court of the city of
Lynchburg, rendered June 22, 1900, on an indictment against
the plaintiff in error for an attempt to rape. The plaintiff in
error was found guilty of assault and battery, and his punish-
ment was fixed at a fine of one thousand dollars, and confinement
in jail for one year.

                                                    *Affirmed.*

The opinion states the case.

*Lee & Howard*, for the plaintiff in error.

*Attorney-General Wm. A. Anderson*, for the Commonwealth.

KEITH, P., delivered the opinion of the court.

Plaintiff in error was indicted in the Corporation Court of
the city of Lynchburg for assaulting Maggie L. Coomes with in-
tent to commit rape. The jury found him not guilty of this
charge, but guilty of assault and battery, and fixed his punish-
ment at one year's imprisonment in jail, and a fine of $1,000.
The prisoner moved to set this verdict aside, which the Corpora-
tion Court refused to do, and from this judgment the case is be-
fore us upon a writ of error.

When the jury were being selected T. A. Jennings, one of
the panel, stated upon his *voir dere* that he had formed and ex-
pressed an opinion in the case; that it was based upon news-
paper accounts and current reports; that, at the time of his ex-

amination, it was quite a decided opinion, but that he believed
he could fairly and impartially decide the case according to the
evidence adduced at the trial.    Upon cross-examination, he
stated that his mind was "made up from the reports I have heard
and read, and it would take evidence to change it."    Thereupon
counsel for plaintiff in error objected to Jennings as a juror,
and the court sustained the objection, "but before said Jennings
retired from the panel, counsel for prisoner withdrew their ex-
ception, and he was elected as a juror."    Upon motion for a
new trial, counsel filed the affidavit of one Percival that shortly
after the offence was committed he heard Jennings discussing
the matter, and that he said, among other things, that "the se-
verest treatment possible would be too good for Doyle."

The affidavit of one Robert P. Jennings was also filed, who
swears that he is "the uncle of T. A. Jennings, who was one of
the jurors who tried and rendered the verdict in the case of
Commonwealth against Edward J. Doyle, at the June term of
the Corporation Court of the city of Lynchburg (he being the
son of my brother); that Mittie Lee, a sister of Mrs. J. R.
Coomes, the mother of the prosecutrix, Maggie L. Coomes, mar-
ried Joel W. Jennings; that Tiny Jennings, a sister of the said
Joel W. Jennings, married me and is now my wife; and that the
residence of all of said parties has been or is in the same city—
Lynchburg."

We have copied this affidavit in full, because in no other
terms are we able to state the supposed relationship by affinity
between Maggie L. Coomes, upon whom the assault is alleged to
have been made, and T. A. Jennings, the juror, and because we
therefore thought the affidavit itself the strongest possible refu-
tation of the contention that the juror was disqualified by reason
of the facts deposed to by Robert P. Jennings, or that these
facts could be considered as in any degree influencing our con-
clusion.

"Affinity is the relation contracted by marriage between a

husband and his wife's kindred, and between a wife and her husband's kindred, in contradistinction from consanguinity, or relation by blood. A number of authorities define affinity as the connection which arises from marriage between the husband and the blood relatives of the wife, and between the wife and the blood relatives of the husband; or, in other words, they hold that it does not include persons related to the spouse simply by affinity; and it would seem that this definition is supported by the weight of authority." 1 Amer. & Eng. Ency. of Law (2d ed.), 911.

Consequently it is held in *Johnson* v. *Richardson*, 52 Tex. 482, "that the sister and niece of a juror are the wives of two brothers of a party to a suit, constitutes no ground of disqualification."

In *Moses* v. *State*, 11 Humph. (Tenn.) 232: Upon a trial for murder, a juror stated that the sons of his wife by a former marriage were second cousins of the deceased; and this was held not to disqualify him.

"A juror whose brother is joined in marriage with a sister of one of the parties, is not disqualified to sit in the trial." *Chase* v. *Jennings*, 38 Me. 44.

In *Kirby* v. *State*, 89 Ala. 69, it appears that the juror Bryant, being a cousin of the deceased, was related by affinity to the mother of the deceased, but bore no relation to deceased himself, and yet he was held to be a competent juror.

In *Jacques* v. *Commonwealth*, 10 Gratt. 690, on a trial for arson, it was held that the nephew of the deceased wife of the person whose house was burned, if she left children, is an incompetent juror, and if she left no issue, that was a fact for the prosecution to show, and not being shown, the objection was valid.

It is obvious that the case under consideration does not come within the terms of the definition as to what constitutes relationship by affinity. The juror himself says in his counter af-

fidavit that he was utterly unmindful of the fact, and he could hardly have been otherwise, for the connection is so shadowy that it eludes all effort to define it, and is too unsubstantial to be treated as exercising any possible influence upon a juror's conduct. When the objection to Jennings as a juror was withdrawn, prisoner had been fully advised that he had formed and expressed an opinion which it would require evidence to remove, and by the course which was pursued must be held to have taken the chances as to that opinion being favorable or adverse, and to have waived all objection.

In *Bristow's Case*, 16 Gratt. 646, the court said: "To permit prisoners to avail themselves after verdict of pre-existing objections to the competency of jurors as a matter of right would not only be unreasonable, but most mischievous in its consequences. Delays in the administration of criminal justice and the chances for the escape of the guilty would be greatly increased. Proper verdicts, especially in trials for grave offences, would be continually set aside. A prisoner knowing, or wilfully remaining ignorant of the incompetency of a juror, would take the chances of a favorable verdict with him upon the jury; and if the verdict should be adverse, would readily enough make the affidavit necessary to avoid its effect." *Poindexter's Case*, 33 Gratt. 792; *Hite's Case*, 96 Va. 489.

In *Simmons* v. *McConnell*, 86 Va. 500, it was held: "After verdict, they (the defendants) cannot have a new trial for this cause, unless it appears that injustice has been done to them by admitting the disqualified juror."

And in *Beck* v. *Thompson* (W. Va.), 7 S. E. Rep. 447, it was said: "A new trial will not be granted on account of the disqualification of a juror for matter that is a principal cause of challenge which existed before he was elected and sworn as such juror, but which was unknown to the party until after the trial, and which could not have been discovered by the exercise of ordinary diligence, unless it appears from the whole case, made

before the court on a motion for a new trial, that the party suffered injustice from the fact that such juror served in the trial of the case."

It appears from these authorities that in cases where the cause of challenge is unknown at the time the juror is elected and sworn, and which could not have been discovered by the exercise of ordinary diligence, it will not be a sufficient ground for a new trial unless it is made to appear that the parties suffered injustice from the fact that such juror served in the trial of the case.

The case is immeasurably stronger where the disqualification of the juror was known, had been established, and his name had been stricken from the panel. We appreciate the difficulty which, on such occasions, confronts counsel. We recognize the great responsibility resting upon them, but the fact remains that in withdrawing the objection to a juror under such circumstances they had, in contemplation of law, taken the "chances of a favorable verdict with him upon the jury." *Bristow's Case, supra.*

It appears from bills of exception taken during the trial and by affidavit made upon motion to set aside the verdict, that during the progress of the trial the court-room was filled to its capacity with citizens who manifested a strong sympathy with the prosecution. Upon one occasion, when the mother of the young lady upon whom the assault was committed was testifying, there was applause, which the court promptly rebuked, and threatened to clear the court-room. Upon another occasion, during the argument of counsel who assisted the prosecutor, his remarks were applauded, and counsel himself reminded the audience that they were in a court of justice, and such conduct was improper. "The court again threatened to clear the court-room, and then had several police officers stationed in the rear of the court-room to prevent a recurrence of these demonstrations, and to detect the offenders."

It is much to be desired that courts and juries should hear and determine causes submitted to them, especially those which involve the life or liberty of the citizen, free from all extraneous influence of whatever character; that the trial should be guided and directed by the "cold neutrality of an impartial judge," and that the jurors should act without fear or favor with an eye single to meting out justice regardless of all except the law and the evidence. But such an ideal is impossible of attainment, and unhappily that class of cases most likely to stir the passions and sway the judgment of jurors appeals to the sympathies of the community, and the day of trial finds a crowded courtroom. With such an environment it is impossible that the jury should be unconscious of its influence. All outward expression may be suppressed, but its subtle force will be felt despite all efforts to curb and restrain it. Recognizing its existence, and for the want of a better name, we call it magnetism, but however designated, all realize and confess its power. How to meet and counteract it so as to secure to the prisoner a fair trial, and to be assured that the verdict is the free expression of an impartial jury, is a difficult problem. Much must be left to the judgment and discretion of the trial court. It has ample power to vindicate its dignity and authority by the punishment of the disorderly. It may call to its aid the police force, increase its numbers, punish their inefficiency, and exclude any and all persons whose presence is not deemed necessary. Acts 1899-1900, p. 882. Where it has failed to exercise its discretion with becoming vigor, or the public has been so violently excited as to overawe the jury and afford ground for the belief that justice has not been done, it would be the duty of this court to set aside the verdict, but the case before us is not such as to demand or justify interference on our part. The Corporation Court seems to have done all that it ought to have done.

Another ground of error is that the fine is excessive. The only limitations upon the power of a jury in assessing fines in

cases such as this is that found in the bill of rights, which declares "that excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted," and in the rule that the verdict will be set aside where it is such as to satisfy the court that the jury was influenced by prejudice or ill-will.

Counsel for plaintiff in error remind us that as to several other offences of a very grave character the fine has been limited by statute to a sum not exceeding $500. This argument does not strike us as being persuasive of the conclusion to which it is adduced. The jury, independent of such statutes, exercises a discretion controlled only in the manner which we have indicated. That the Legislature has seen fit to restrict their power in certain cases, leaving it undiminished in others, would seem to have the opposite bearing, if any. However that may be, the case before us stands unaffected by any statutory limitation of which we are advised, and we cannot say that the imposition of a fine of $1,000 for an assault by a man upon a young woman is so excessive as to be repugnant to the constitutional provision which we have cited, or constrain the court to say that it was evidence of bias or prejudice on the part of the jury.

We come now to the only remaining assignment of error, that the verdict was contrary to the law and the evidence.

The families of Miss Coomes and plaintiff in error are neighbors, living in the city of Lynchburg. She was a frequent visitor at the home of plaintiff in error, and they were upon terms of familiar intercourse. Upon the day of the occurrence which is the subject of this prosecution, she, passing along the street in the direction of her home, was joined by plaintiff in error. They walked together a short distance to the point where their paths diverged, and they parted, he going in the direction of his and she towards her home. After going a few steps he asked her to go with him, and she replied: "No, I won't go. I am afraid Katie (his sister) might not be at home;" to which

he replied, "Of course she is at home;" and thereupon they walked together to his father's house. When they got there he went around the back way through the basement to open the front door for her. After opening it, he went about half-way up the stair leading to the upper floor and saying: "Katie must be in the kitchen," came down and closed the door at the rear of the hall, and those opening into the parlor and sitting-room, and coming to where she stood looking at a vase of roses, passed her, and pushed the front door, which did not shut, but left an open space of something more than an inch. Then approaching the prosecutrix, he put his arm around her and attempted to kiss her, and she struck him in the face with her purse and screamed for his sister. He did not, however, release her, but tightened his hold, and, with one arm around her, he put his other hand under her clothes, between "her knee and her waist." Then for the first time, as she says, it "flashed across me what he was doing, and then I told him to let me loose, and that I intended to tell papa exactly what he did, and he let me loose and said, 'What,' just like he was surprised, and then I turned and slammed the door in his face and went out the gate, and into the street, and on the way met Mr. Burrow." She was so violently agitated as to attract his attention. He asked her what was the matter, and she told him that she had been insulted. She went home, and at once told her mother what had occurred.

There is a conflict in the evidence upon many points. The narrative of the transaction as given by plaintiff in error would acquit him of all criminal intent, and reduce the offence to simple assault, and the verdict of the jury might well be deemed a harsh punishment if his account is to be accepted. But the jury are the judges of the credibility of witnesses, and their verdict solves all conflicts and contradiction among them. A court has no power to grant a new trial unless the verdict is against the law, or is contrary to the evidence, or is without evidence

to support it. *Grayson's Case*, 6 Gratt. 723. These principles are conclusive in this case, for the testimony adduced by the Commonwealth is amply sufficient to support the verdict.

The jury acquitted him of the horrid crime with which he was charged, but the facts recited show that he committed an indecent assault. It is unhappily too true that the bonds of family and social discipline are much relaxed; that the intercourse between the sexes, and especially between the youth of both sexes, is far more free and unconventional than in former times. Little authority is exercised to regulate or restrain the heedless or the vicious, except the law as administered in the courts, and the circumstances disclosed in the evidence before us, while they do not sustain the principal charge, prove an offence which it was the duty of the jury to punish with a severity greater than would be proper in ordinary cases of assault and battery. It was that of a young man upon a respectable girl, just verging upon womanhood, whose person he should have held sacred and inviolate. He seeks to excuse himself by recalling the intimate relations existing between them, and something may be pardoned to that consideration, but it cannot be doubted that he transcended the limits which had theretofore characterized their intercourse.

The judgment of the Corporation Court of the city of Lynchburg must be affirmed.

CARDWELL, J., dissenting:

I am constrained to withhold my assent to the conclusion reached by the court in this case.

The paramount object of the law, especially in trials involving the life or liberty of a citizen, is to guarantee a fair trial, without which one accused of crime ought not to be convicted. This has been so often repeated by law-writers that no citation of authority is needed for the support of the proposition.

Indeed, the opinion of the court says: "It is much to be desired that courts and juries should hear and determine causes submitted to them, especially those which involve the life or liberty of the citizen, free from all extraneous influence of whatever character; that the trial should be guided and directed by the 'cold neutrality of an impartial judge,' and that the jurors should act without fear or favor, with an eye single to meting out justice regardless of all except the law and the evidence. But such an ideal is impossible to attain, and unhappily that class of cases most likely to stir the passions and sway the judgment of jurors' appeals to the sympathies of the community, and the day of trial finds a crowded court-room. With such an environment it is impossible that the jury should be unconscious of its influence. All outward expressions may be repressed, but its subtle force will be felt despite all efforts to curb and restrain it. . . ."

. I agree, as the opinion further says, that under such conditions, much must be left to the judgment of the trial court, but I do not agree that such conditions as are described and, as existed in the court-room during the trial in this case, may exist, and it still be said that the accused has had the fair trial to which he was entitled under the law. An "ideal" trial may not be attainable, but if all the precautions known to the law are taken, a fair trial may be had in every case, and never in the history of our jurisprudence was it more essential that all precautions against an unfair trial in a case of this character be taken than at the present day.

That the learned and conscientious judge who presided at this trial did all that he considered to be necessary to secure a fair and impartial trial, I do not question for one moment. But, as an appellate court, we are called upon to review the record of the proceedings, and to determine the question addressed to our judgment whether or not such a result has been attained.

I concede that the relationship, by affinity, between the juror

Jennings and the prosecutrix was not of itself sufficient to justify the setting aside of the verdict and awarding a new trial, but the declarations of that juror before the trial may well be considered in determining whether or not the jurors have acted "without fear or favor with an eye single to meting out justice, regardless of all except the law and the evidence." The declarations of this juror but gave expression to the sentiment wide-spread in the community, demanding the conviction and severe punishment of the accused, founded not upon the facts as to what had actually occurred, but upon the enormity of the crime suggested, and that sentiment and demand culminated in a gathering in the court-room during the progress of the trial "until it was filled to its capacity" with citizens who manifested a strong sympathy with the prosecution. The record discloses that before the sentiment referred to had reached the violent state to which it ultimately went, neither the prosecutrix nor her parents were of opinion that so grave an offence had been committed by the accused as he was afterwards tried for, and that, but for the failure to send a letter of apology or explanation by a special messenger instead of by mail, it is more than probable that the prosecution would never have come to a trial.

The trial lasted two days. On the first day the demonstrations of the crowd facing the jury were such as to call forth a rebuke from the presiding judge, and a threat to clear the court-room, but the crowd remained until the second day, when their demonstrations became so pronounced that counsel aiding in the prosecution in the midst of his argument, feeling keenly the injustice to the accused, and their derogation of the good order and fairness of the trial, turned upon the crowd and administered to them a rebuke by calling their attention to the fact that they were in a court of justice, and that such manifestations were improper. The crowd remained to the end of the trial, the only precautions taken during its last stages being

Dissenting Opinion.

a threat from the court to clear the court-room, and the placing of policemen among the crowd to prevent a recurrence of the demonstrations, and to detect the offenders.

The Legislature, in its wisdom, has provided, in the interest of good order, and fair and impartial trials, that the court-room may be cleared of any and all persons whose presence is not deemed necessary. This, it is true, leaves the matter in the discretion of the court, but, as the opinion of this court further says: "Where it has failed to exercise its discretion with becoming vigor, *or the public has been so violently excited as to overawe the jury and afford ground for the belief that justice has not been done, it would be the duty of this court to set aside the verdict."* . . . Just here is the point at which I differ with my brethren. They take the view that "the case before us is not such as to demand or justify interference on our part." I take exactly the opposite view.

Recognizing the necessity for greater precautions against a violently excited public, overawing jurors in trials involving the life or liberty of the citizen, the statute adverted to was enacted, authorizing the clearing of the court-room of angry or excited crowds during such trials, and intending also, it is true, as a protection to the feeling of those whose presence is neccessary to a trial like this, as well as to exclude persons of tender years who should not be permitted to hear such trials; and this wise provision of the law merits, if indeed it does not demand, a rigid enforcement by the court, that the citizens of every community within our borders may be made to understand that, no matter what the offence for which the life or liberty of the citizen is put in jeopardy, he is to have that fair and impartial trial that the law designs he shall have.

It is not necessary to a new trial that it be shown that undue or extraneous influence, any more than illegal or irrelevant testimony, had its effect upon the jury. It is enough, if it appears that the jury may have been so affected or influenced. The

manifestations of an excited crowd, such as took place during this trial, were but expressions of opinion that the prosecution should result in the conviction and punishment of the accused. The effect, in my judgment, is the same in such a case as in one in which the mere opinion of a witness, or illegal or irrelevant testimony, which may have had its effect, has been allowed to go to the jury. The object sought in excluding mere opinions, improper or irrelevant testimony, in isolating the jury, and in preventing communications by third persons, is to prevent the jury from being biased by any extraneous influence.

As it seems to me, especially in cases like this, no influence is so potent, so well calculated to improperly influence the minds of the jury, as the consensus of public opinion repeatedly expressed in their very presence. This has been so fully realized by trial judges that it has become almost, if not altogether, a universal practice to exclude the newspapers of the day from the jury during a trial of felony cases. Precautions such as this, and the clearing of the court-room of a crowd manifesting their opinions by applause or otherwise, cannot be overestimated, or be too rigidly enforced, in trials of this character.

In speaking of illegal evidence in *Payne's Case*, 31 Gratt. 855, the court said: "We cannot say what effect this illegal evidence may have had on the minds of the jury. It was well calculated to influence them. In such a case the rule of this court is that the judgment must be reversed." Again, in *Joyce v. Commonwealth*, 78 Va. 287, speaking on the same subject, it was said: "It was irrelevant, and calculated to excite and mislead the jury, and so prejudice the prisoner. If he may have been so prejudiced, though it is doubtful whether he was so or not, that is sufficient ground for reversing the judgment." Citing *Payne's Case, supra*.

The same view is taken by the court in the civil case of *So. Mu. Ins. Co. v. Trear*, 29 Gratt. 259.

While these citations are not entirely in point, no other deduc-

tion can be drawn from them than that it is not because of the possible effect of the undue influence upon the jury, nor because of its nature or name, but, if any unlawful influence might have had the effect of prejudicing the cause of the defendant with the jury, whether it be illegal or irrelevant testimony or other undue influence, such as was brought to bear upon the jury in this case, a new trial must be awarded. In other words, whether the improper influence brought to bear upon the jury, be in legal or illegal form, and it appears that such influence may have affected the result, the verdict should be set aside. Why the precautions that the law takes, in all felony cases, of requiring the veniremen to be secured from a locality remote from the scene of the alleged offence; that they be examined on their *voir dire* to ascertain, if possible, if they have any bias or prejudice, &c., or have formed or expressed an opinion as to the guilt or innocence of the accused; that the officer in charge of the jury be under his oath required to keep the jury together and not speak to them himself, nor suffer another to speak to them touching the trial, if it is not for the purpose of keeping the jury freed from all influences beyond the evidence in the case? Why these precautions, if the influence of the sentiment of the community in which the offence is alleged to have been committed, or of the public generally, may be brought to bear upon the jury, by demonstrations repeatedly made, as in this case, by an excited and infuriated crowd, unmistakably giving expression to the opinion that the accused is guilty, and should be severely punished?

It is not a sufficient answer to say that "it is not to be assumed that the jury would violate their oaths and render a verdict upon what occurred in the court-room in the way of demonstrations from the crowd, which the jury knew perfectly well were not evidence," any more than the answer that it is not to be assumed that the jury would violate their oaths and render a verdict influenced by illegal or irrelevant testimony, or mere opinions of

witnesses which have been improperly allowed to go before the jury.

That the undue influence operating upon the jury at the trial of this case, spoken of in the opinion of the court and here, not only may have had its effect upon the jury, but in fact did have, is to my mind apparent from the record.

Of the charge made in the indictment the jury acquitted the accused, but found him guilty of an assault and battery—a purely technical offence—fixing his punishment at one year's imprisonment in jail, and a fine of $1,000, a fine double the limit fixed by statute, (sec. 3671 of the Code,) for the crime of shooting, etc., with intent to kill; by sec. 3672 for the crime of shooting, stabbing, etc., in the commission of or attempt to commit a felony; and by sec. 3706, for entering a dwelling house, etc., with intent to commit larceny, or any felony other than murder, rape or robbery. Not only is the fine double the limit fixed by law for the offences just mentioned, and for other grave offences, but is imposed upon the accused, a young man just twenty-one years of age, in the face of the uncontroverted fact that he hasn't any estate whatever out of which to pay it. True, as the opinion of the court states, there is no express statutory limit to the fine that a jury may impose for a misdemeanor, but, as it seems to me, when considered in the light of the declaration, found in our bill of rights, that *excessive fines ought not to be imposed*, and in view of the fact that the Legislature has limited the fine that may be imposed in felony cases to $500, it cannot be supposed that it was contemplated that, by vesting the jury with discretion in misdemeanor cases, the Legislature conferred upon the jury the uncontrollable right to inflict greater punishment than had been fixed by statute for a felony.

The rule, as old as the written law, is that a fine must have reference to the *estate* of the defendant. As stated by Mr.

Blackstone: "What is ruin to one man's fortune, may be a matter of indifference to another's."

I shall not review the evidence in the record. Suffice it to say, it does not impress me as it seems to have impressed the majority of the court.

By their verdict the jury have said that the accused, in what he did, was not moved by a desire to take undue and indecent liberties with the prosecutrix, and that his actions were unaccompanied by such intent. If, therefore, regarding her as a child, with whom he had grown up on the most intimate terms, and with whom he had previously romped in very much the same manner (as it is conceded he had) he did the acts complained of, from no improper motive, and without evil intent, the punishment meted out to him must appear to any unbiased mind as harsh and unreasonable.

The circumstances and facts surrounding the trial, as shown by the record, not only justify, but impel, as I conceive, the conclusion that the punishment was not the result of the candid and unbiased judgment of the jury. Restrained by conscience and the evidence from pronouncing the accused guilty of the charge made against him, the jury so far yielded to the pressure brought to bear upon them as to impose a harsh and an unreasonable punishment for a purely technical offence.

For the foregoing reasons, I am of opinion that the accused should be awarded a new trial.

*Affirmed.*