# CHARLESTON.

## STATE *v.* HARRY LATTIMAR.

Submitted March 14, 1922.   Decided March 21, 1922.

CRIMINAL LAW—*Conviction Set Aside for Failure to Accord Fair and Impartial Trial.*

Where a person has been arrested for an alleged crime, committed on the day of the arrest, and on the day following is indicted, tried, convicted, sentenced to hang, and immediately taken to the penitentiary for that purpose, and it appears that he has been given no time to prepare his defense, was assigned counsel after he announced that he was ready for trial and plead not guilty, and the judge certifies that he knew that feeling was running high against the accused in and about the court house, and that he had some fear of mob violence being inflicted upon the accused if a speedy trial was not had; and it appears that no witnesses were summoned for the defendant, no motion made for change of venue, improper evidence admitted on the trial without objection on the prisoner's part, and a feeble and perfunctory defense interposed, the appellate court will set aside the verdict and award the prisoner a new trial, because he has not been accorded a fair and impartial trial.

Error to Circuit Court, Mingo County.

Harry Lattimar was convicted of rape, and he brings error.

*Reversed and remanded.*

*Thomas West,* for plaintiff in error.

*E. T. England,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

About 6 o'clock, P. M. of September 7, 1921, defendant, a negro man, was arrested in the City of Williamson in Mingo County, and placed in the county jail.   The next morning he was taken to the court house, circuit court then being in session, and was informed that he had been indicted for the crime of rape, alleged to have been committed upon Wanda Varney, a white girl, about 8 years old, on the day

of his arrest.    He immediately announced that he was ready for trial, and, upon being arraigned, pleaded    not guilty.    The court then asked if he had counsel and the prisoner replied in the negative.    Upon being asked if he desired counsel, he replied in the affirmative, and    counsel was then assigned to defend him.    The trial proceeded immediately, resulting in a verdict of guilty as charged, followed by sentence of death to be executed on October 17, 1921.    That afternoon or evening he was placed on a passenger train and conveyed to the penitentiary.    The crime was alleged to have been committed on the 7th and on the 8th the indictment was returned, trial had, sentence pronounced and the prisoner on his way to the penitentiary to be hanged.    An inspection of the evidence taken discloses that much of the State's evidence was hearsay, to which no objection was interposed.    Defendant had no witnesses summoned, although it appeared that the alleged crime was committed in the day time, in a shanty, a very short distance from other inhabited houses, and that there were numerous persons in the near vicinity.    Cross-examination of the witnesses was perfunctory and feeble. The prisoner was placed on the stand and asked his name, where he worked, and if he was guilty or not guilty.    He gave his name, where and for whom he worked, and answered that he was    not guilty.    The examination then ceased.    It is unnecessary to detail the evidence of the prosecution, although it is unsatisfactory in many particulars.    Possibly it is sufficient to sustain the verdict, and if it had been apparent that the verdict had been arrived at by calm and impartial deliberation, uninfluenced by the sinister circumstances dominating the whole trial, it would likely not be disturbed.

What motive induced the extraordinary speed and result of this trial.  Has the prisoner had a fair trial?  Has he been accorded due process of law and equal protection of the laws as guaranteed by our Constitution?

The reason of this exceedingly hurried conviction    is apparent in a "Statement by the Court" which has been made a part of the record and which is in substance as follows:

"***that the indictment in the above styled case was duly returned into court by a regularly constituted grand jury on the morning of the 8th day of September, 1921, charging the defendant, Harry Lattimar, with rape upon one Wanda Varney, alleged to have been committed on the day before; I knew that feeling was running high against the accused in and about the court house and had some fear of mob violence being inflicted upon the accused if speedy justice was not meted out to him by the court, and I caused the accused, who appeared intelligent, and certainly of mature years, and competent to take care of himself upon the occasion, to be brought immediately before the court, and he announced ready for trial immediately upon inquiry, and entered his plea of not guilty.

"I then inquired if he had counsel and being advised that he had not, and on being asked if he desired counsel and he having answered in the affirmative, *** a young, active and reputable attorney of the Mingo County bar was appointed by the court to represent the defendant at the trial and the trial proceeded.

"On motion of the defendant by his attorney this statement is made a part of the record of this case, this the 10th day of October, 1921, and at the same term of court at which the defendant was tried."

The mob has dictated this conviction. The bloodthirsty mob spirit permeated the atmosphere of the trial, and had its effect upon court and jury. It is true that no effort was made either for continuance or change of venue. Does not this of itself impel the conclusion that fear of a lynching influenced the deliberate judgment of the court and overawed the defense? Under the stress of this situation it would not have been surprising if the prisoner had plead guilty, thereby hoping to escape the threatening mob, and thus prolong his life. What would have followed if the jury had found that the evidence was not conclusive of guilt beyond a reasonable doubt? There would likely have been an appeal to the more inflamed judgment of self constituted judges, with the usual results. The defendant may be guilty; that does not concern us. But he is entitled to a

90 W. Va.

fair and impartial trial, to the calm, deliberate and unin-
fluenced judgment of his peers.     Orderly and constituted
government demands such trial.     It is a safeguard in which
all members of society are interested and which should be
jealously upheld and guarded.     A judicial lynching is a
graver and more startling crime than a lynching by the ir-
responsible rabble.     It undermines the foundation of order-
ly government and weakens respect for law and order. Much
of the success of any form of government depends upon the
opinion of those governed of its power to protect them in
the administration of the laws, and in the wisdom and in-
tegrity of those who govern.     When the courts do not up-
hold the laws, respect for law and for government ceases.
There should be no compromise with the spirit of lynching
for any crime.     The mob in Jerusalem was clamoring to
Pilate to crucify the Savior.     He "washed his hands" of
guilt, and released the Christ to the "tender mercies" of
his accusers, thereby perpetrating the greatest judicial
crime of the ages.     The representative of imperial Rome
compromised with the congregated doers of evil.     It is little
wonder that the Empire declined and fell.     What we have
said is entirely impersonal and is not to be considered as
reflecting upon the conduct of the officials in charge of the
case.     The circumstances may have impelled the choice of
what was then considered the lesser evil.     The duty is
therefore more imperative upon this Court to annul the re-
sult brought about by a choice of evils, and to preserve to
every member of society, however humble he may be, or how-
ever guilty he may be, the right of fair and impartial trial.
The unusual hurry to remove the prisoner from the city
after conviction is significant of the intensity of feeling
against him, and indicative of the fear of the officers of vio-
lence.     But we are not left to circumstances alone for our
conslusions.     The learned Judge states, "I knew that feel-
ing was running high against the accused in and about the
court house, and had some fear of mob violence being in-
flicted upon the accused."     The psychological influence of
public opinion upon a jury is well recognized.     It reaches
a jury unperceived; but when it is plainly discernible in

and about the court house and in the presence of the jury, the presumption is almost conclusive that the jury's verdict was affected by it.      In the case of *Woodfolk* v. *State,* 81 Ga. 558, while the attorney for the State was making the closing argument, the crowd in the court room applauded and some persons back in the audience cried, ''Hang him! hang him!''      The presiding judge rapped for order and gave instructions that the disorderly persons be removed from the court room—an order which was not carried out.      The supreme court said that the judge's action was not drastic enough; that they should have been severely punished, and taught that the trial of a man for his life, however henious the crime charged against him might be, was a serious and solemn thing, and that the law would not permit a mob to interfere either by applause, or by threatening and exciting cries.      Although the members of the jury made affidavit that this incident made no unfavorable impression on their minds, the supreme court set aside the verdict.      However, other errors appeared in that trial, and the reversal was not wholly upon the incident detailed above.      Where the public has been so violently excited as to appear in the court room and surround the court house during the trial of a capital offense in such manner as to overawe the court and jury, it will afford ground for presumption that justice has not been done; that a fair trial has not been accorded, and the appellate court will not be slow to set aside the verdict.      The courts in this country universally uphold the Constitutional guaranty of a fair and impartial trial to the accused, and there are many cases where verdicts have been set aside upon less grounds than appears in this case.      *Doyle* v. *Commonwealth,* 100 Va. 808; *Meyers* v. *State,* 97 Ga. 76; *State* v. *Weldon,* 91 S. C. 29; *Sanders* v. *State,* 85 Ind. 318; *People* v. *Mahon,* 244 Ill. 45; *State* v. *Wilcox,* 131 N. C. 707.

It will be observed that when the prisoner was arraigned for trial he announced himself ready and then plead not guilty.      He was then asked if he desired counsel, and answered in the affirmative, when counsel was assigned to defend him.      While it is probable that this failure to assign

counsel before plea and announcement of readiness for trial would not be error, under our decision of *State* v. *Yoes*, 67 W. Va. 546, it is another circumstance to show that the prisoner was rushed into trial with undue haste, and without proper regard for his Constitutional rights.

We are of the opinion that the prisoner has not had a fair trial, and that the lower court committed palpable error in not sustaining his motion for a new trial.

*Reversed and remanded.*