## 32637. FOUTS v. THE STATE.

NICHOLS, Chief Justice.

The appellant, Ronald Terry Fouts, was convicted on March 3, 1977 for the January 10, 1977 murders of Randy Reeves and Stanley Dorsey and for theft by taking.

Mrs. Reeves testified that on the morning of January 10, 1977, she left her home for work, leaving her husband, Randy Reeves, and Stanley Dorsey asleep in the house and that she returned at 1:15 p.m. to find the house in disarray, the back door open, six guns which were usually kept in the gun cabinet missing, stains on the sofa and carpet that appeared to be blood and her husband and Stanley Dorsey gone.

An employee of Southern Bell testified that she came to install a telephone at the Reeves residence about 8:30, that she saw two men there who told her where to put the telephone and that as she was leaving, two other men arrived in an automobile. She did not identify the defendant at trial, however.

A neighbor of the Reeves testified that on the morning of January 10, he noticed a light green Ford station wagon with wood paneling back out of a nearby unused driveway, that the car passed slowly in front of him, that he saw two people inside, and that the driver stared at him enabling him to see the driver's face. He identified the appellant as the driver of the car. He further testified that later the same day he saw the same car first parked next to a telephone company van in front of the Reeves residence, and later parked behind the Reeves home.

Jody Gresham, who was the defendant's accomplice in the murders, testified for the state. He stated that the appellant and the appellant's brother picked him up on the morning of January 10, that after some errands the appellant took his brother home, that he and the appellant then proceeded to Randy Reeves' house, that after they entered the house, the appellant began arguing and fighting with Randy Reeves over an illegal drug transaction and that the appellant struck Reeves in the head with a stick during this fight. He further testified that to prevent Randy Reeves from pulling a gun, he (Jody

Gresham) cut Randy Reeves across his back, that the appellant then grabbed the gun and, after some deliberation, shot both Randy Reeves and Stanley Dorsey. He further testified that the appellant moved his car, a light green Ford station wagon with wood paneling, to the back of the Reeves house, that the appellant instructed him to wrap in a blanket some guns that were in a gun closet in the house and place the guns, as well as the victims' bodies, into the car, that they drove to a wooded area where they dumped the bodies into a well, hid the stolen guns under some logs and disposed of the murder weapon, a .25 caliber "Titan" pistol, in a tree stump and that later that evening he complied with the appellant's request to help the appellant and two friends, Mac Cleveland and David Jones, find the pistol to sell to David Jones.

David Jones corroborated Gresham's testimony about the search for the pistol. He testified that although the .25 caliber pistol could not be found, he later returned to the same area and found several guns which were wrapped in a blanket.

Sheriff Gilbert testified that Gresham directed him to the well where the bodies were hidden. Expert testimony identified blood scrapings taken from appellant's green station wagon as matching the victims' blood type and identified bloodstains on a stick found near the well as matching Reeves' blood type. Expert testimony further established that hair found on a hairbrush which was discovered near the bloody stick was microscopically identical to hair samples taken from the appellant's head.

Derrell Stowe, a prison trustee, testified that he was given several notes by the appellant to be delivered to Gresham and to the appellant's brother. He gave all the notes to the authorities. The notes, which the defense stipulated were written by the appellant, sought to persuade Gresham to take the blame.

The appellant made two conflicting statements to the police. In the later one he stated that he lent Gresham his car around 10 a.m. on January 10, 1977, and did not get it back until 3 p.m.

1. The appellant enumerates as error the trial

court's overruling of his challenge to the composition of the grand jury on the grounds of underrepresentation of blacks, individuals under the age of 34, and women.

The general test to be utilized when reviewing the composition of a grand or petit jury was set out in *Pass v. Caldwell,* 231 Ga. 192 (200 SE2d 720) (1973) and Whitus v. Georgia, 385 U. S. 545 (87 SC 643, 17 LE2d 599) (1966). Basically, the test provides that a prima facie case of racial discrimination is set out by establishing that an opportunity for discrimination existed from the source of the jury list and that use of the infected source produced a significant disparity between the percentages found present in the source and those actually appearing on the grand and traverse jury panels.

A. Challenge with Regard to Black Representation.

The appellant's assertion that the grand jury pool contained only 10.1 percent black is unfounded. Mrs. Bolton, jury commissioner for Spalding County, gave uncontradicted testimony that there were 118 blacks out of the total 784 individuals on the grand jury pool, approximately 15 percent of the total pool. There is no dispute between the parties as to the percentage of blacks eligible for grand jury duty in Spalding County. It is 22 percent. We think that these percentages show that blacks were adequately represented. See Turner v. Fouche, 396 U. S. 346 (90 SC 532, 24 LE2d 567) (1969).

B. Challenge with Regard to
Representation of Persons Under the Age of 34 Years.

The appellant contends that the grand jury was unconstitutionally composed because there was an underrepresentation of persons under 34 years of age. This contention need not be considered because age is not a recognized class for the purposes of grand jury representation. *Barrow v. State,* 239 Ga. 162 (236 SE2d 257) (1977); *State v. Gould,* 232 Ga. 844 (209 SE2d 312) (1974).

C. Challenge with Regard to Women's Representation.

Appellant's final basis for challenging the composition of the grand jury is that women are

underrepresented. This contention raises a harder question because the disparity in percentages is sizeable.

Although there is some disagreement as to the actual percentage of eligible women in the community, it can be roughly placed at 50 percent. There is no dispute that the percentage of women selected for the grand jury pool was 22.7 percent. This disparity between the percentages of women in the community who are eligible for duty and the percentage of women ultimately selected into the grand jury pool is sufficiently "significant" to satisfy the first part of the Whitus test.

Now we come to the phase of this opinion which makes application of the two-tier Whitus test appear nonsensical — that is, determining whether or not an opportunity for discrimination has been shown. The state, in a good faith effort to show beyond a doubt that no discriminatory intent motivated the selection of the jury pool, has itself established the second prong of the test. The jury commissioners testified at length that they were aware of their duty to insure that the ultimate jury pool consisted of a proportional representation of all the "significantly identifiable groups" in the community. They testified that they worked many hours as a committee and individually to increase the number of blacks and women that would ultimately be found on the grand jury list. The record is replete with undisputed testimony of the commissioners' tireless, prolonged, conscientious and exhaustive efforts to locate as many qualified women and blacks as possible in order to increase the proportional representation of the grand jury pool.

Perhaps the most convincing bit of evidence that the low number of women in the grand jury pool was not the result of discrimination is that three of the six jury commissioners were women. The evidence also shows that the women's participation in selecting jurors was not passive. Commissioner Elaine Bolton testified "I am a woman; I pushed to get a lot more women on." Commissioner Reba Matthews testified that all the jury commissioners made a concerted, as well as an individual, effort to select a jury pool which would be fairly

representative. While this court recognizes that mere affirmations of good faith have been held insufficient to overcome prima facie cases of discrimination (*Barrow v. State,* 239 Ga. 162, supra), the testimony by the female jury commissioners can be used to show that they actively participated in the selection process. Moreover, the testimony of the jury commissioners went beyond mere statements that they did not discriminate. The testimony clearly showed the procedure employed by the commissioners to obtain an increase in the number of blacks and women in the grand jury pool. They achieved this result with regard to black representation.

It would have indeed been helpful in this case if the state had offered clear evidence as to why more women were not drawn into the jury pool. However, we cannot say that this neglect results in an unconstitutionally composed grand jury. There was sufficient evidence here to authorize the trial court's denial of the defendant's challenge to the grand jury composition. We think that the evidence shows that the underrepresentation of women on the grand jury was not the result of discrimination by the jury commissioners, and therefore refuse to overturn the trial court's findings. "A defendant is not constitutionally entitled to a venire or jury roll of any particular composition, but the 14th Amendment Equal Protection and Due Process Clause and the 6th Amendment Right to a Jury Trial do require that the state not deliberately and systematically exclude identifiable and distinct groups from their jury lists. Taylor v. Louisiana, 419 U. S. 522 (95 SC 692, 42 LE2d 690) (1975)." *Sanders v. State,* 235 Ga. 425, 429 (219 SE2d 768) (1975).

2. The appellant argues that the trial court erred in denying his motion for a continuance on the ground of the absence of a witness who was at the time of trial incarcerated in a Tennessee prison. Code Ann. § 81-1410 sets out the items which need to be shown by a party before a continuance will be granted because of the absence of a witness. It was a proper exercise of the trial court's discretion to deny the motion for a continuance when these items were not shown. *Harris v. State,* 142 Ga. App. 37 (234 SE2d 798) (1977).

3. The appellant argues that the trial court erred in

overruling his motion to suppress the introduction into evidence of hair samples taken from his head. We find that there was no violation of the defendant's constitutional right against self-incrimination. The evidence shows that prior to the taking of the hair samples, the defendant was given the standard Miranda warnings and that although the appellant was not told that he did not have to cooperate, he brushed his hair without objection so some strands could be obtained.

Schmerber v. California, 384 U. S. 757 (86 SC 1826, 16 LE2d 908) (1967), found no violation of the defendant's constitutional rights when he was required to submit to the taking of a blood sample. "[T]he privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature, and . . . the withdrawal of blood and use of the analysis in question in this case did not involve compulsion to these ends." Id. p. 761. See also Creamer v. State, 229 Ga. 511 (192 SE2d 350) (1972) (where this court held that forcing a defendant to submit to a safe surgical operation to remove a bullet which might be used in evidence in his subsequent criminal trial was not violative of state or federal constitutional law).

4. The appellant argues that the trial court erred in allowing the prosecutor, an investigating officer, to testify after the rule of sequestration had been invoked when the prosecutor had remained in the courtroom without court permission. The prosecutor remained at the counsel table with the district attorney throughout the course of the trial after both sides invoked the rule of sequestration. The defendant did not make objection to this fact until the district attorney called the prosecutor as a witness. Upon assertion by the district attorney that the witness' presence was needed for an orderly presentation of the case, the court allowed him to testify, but only after ruling that it would instruct the jury that violation of the rule of sequestration impairs the witness' credibility.

This same situation was faced in Larkins v. State, 230 Ga. 418 (197 SE2d 367) (1973), except that in that case there were no curative instructions given by the trial court. This court in Larkins found that under such

circumstances it was not an abuse of the trial court's discretion to allow the prosecutor-witness to testify. The trial court did not abuse its discretion in allowing the witness to testify.

5. The defendant argues that the trial court erred in failing to require full compliance by the district attorney with its Brady request for production of criminal records of persons the state intended to call as a witness. When this motion was first made by the defendant, the trial court, after an in-camera inspection of the district attorney's file, ordered the state to meet with the defense and turn over the requested documents. After this meeting, the defendant's counsel stated that he was completely satisfied that the district attorney had complied with his Brady motion.

Later in the trial, when the district attorney objected to the defense counsel's attempt to impeach the character of a state's witness, a prison trustee, the defendant's attorney charged the district attorney with failing to disclose the witness' criminal record. The district attorney responded that he did not have a "rap sheet" on this witness, that his criminal record was local and could be found by examining public records in the same courthouse and that the defendant had waived any argument along this line when he stated earlier that the state had fully complied with his Brady motion. Moreover, the defendant was allowed on cross examination to inquire into the criminal record of the witness which disclosed prior felonies and misdemeanors.

As we read the record, the district attorney did not have information about this witness' background assembled for trial. Rather, he merely knew from general knowledge that the witness, a prison trustee, had a local record. We cannot read Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215)(1963), as requiring the state to take the trouble to obtain a certified copy of a local record in this situation. " 'The test is whether the undisclosed evidence was so important that its absence prevented the accused from receiving his constitutionally-guaranteed fair trial. . .' Jackson v. Wainwright, 5 Cir., 1968, 390 F2d 288." *Carter v. State,* 237 Ga. 617, 619 (229 SE2d 411)

(1976). An application of this test to the facts of this case shows beyond a doubt that *"even assuming* the State did have a duty to obtain such information for the defendant, failure to do so did not prevent him from receiving a fair trial."

6. Finally, the appellant argues that the trial court erred in failing to grant his motion for directed verdict on the ground that the evidence corroborating the testimony of the accomplice was insufficient to prove the identity and participation of the accused. This contention is without merit; the evidence corroborates the accomplice's testimony in almost all relevant particulars.

*Judgment affirmed. All the Justices concur, except Undercofler, P. J., Hall and Hill, JJ., who dissent from Division 1C.*

Argued September 19, 1977 — Decided October 25, 1977.

*Howard P. Wallace, C. Arthur Moss, Jr.,* for appellant.

*Johnnie L. Caldwell, Jr., District Attorney, Arthur K. Bolton, Attorney General, James L. Mackay, Assistant Attorney General,* for appellee.