**AMERICAN FORK CITY, Plaintiff and Respondent,**

v.

**Louis L. CROSGROVE, Defendant and Appellant.**

No. 19174.

Supreme Court of Utah.

June 4, 1985.

Sheldon R. Carter, Provo, for defendant and appellant.

Rollin Thorley, American Fork, for plaintiff and respondent.

DURHAM, Justice:

The defendant Crosgrove was convicted in the circuit court for Utah County of driving under the influence of alcohol in violation of U.C.A., 1953, § 41–6–44 (Supp. 1982). The district court sustained the conviction. The defendant alleges on appeal that the results of a breathalyzer test he was required to take should have been suppressed and that his conviction should be reversed.

The facts are not disputed. On April 17, 1982, the defendant was arrested for driving under the influence of alcohol. He was taken to the American Fork City Police Department, where he was asked to take a breathalyzer test. At first he refused, but he submitted to the test when the officer told him that his refusal could result in the loss of his driver's license under Utah's implied consent statute, U.C.A., 1953, § 41–6–44.10 (Supp.1981). At the defendant's trial, evidence of the results of the breathalyzer test was admitted over the defendant's objection.

Utah's implied consent statute provides that any person who operates a motor vehicle in the state has given his consent to a chemical test of his sobriety. If a motorist refuses a test, his driver's license is revoked for one year and evidence of his refusal to take the test is admissible in any civil or criminal action against the motorist arising out of the incident of his driving under the influence of alcohol.

The sole issue on appeal is whether a person who submits to a breathalyzer examination under the threat of having his driver's license revoked has been "compelled to give evidence against himself" in violation of article I, section 12 of the Utah Constitution. We note initially that, of all the jurisdictions that have considered the question under similar constitutional provisions, the great majority have held that compulsory chemical tests to determine intoxication do not violate the privilege against self-incrimination.[1] The defendant maintains, however, that a contrary result

---

1. The only case we have found to the contrary that is still good law is *Booker v. Cincinnati*, 22 Ohio L.Ab. 286 (Common Pleas, Hamilton Co. 1936) (urinalysis). Apparently the Ohio Supreme Court has not had occasion to consider the issue under the Ohio Constitution's self-incrimination clause.

 Decisions upholding breathalyzer or other tests to determine intoxication in the face of constitutional attacks include the following: *People v. Conterno*, 170 Cal.App.2d Supp. 817, 339 P.2d 968 (1959); *People v. Ramirez*, 199 Colo. 367, 609 P.2d 616 (1980) (field sobriety test); *State v. Smith*, 47 Del. 334, 91 A.2d 188 (Super.Ct.1952) (sobriety test); *State v. Mitchell*, Fla., 245 So.2d 618 (1971) (blood test); *Purvis v. State*, 129 Ga.App. 208, 199 S.E.2d 366 (1973); *Commonwealth v. Brennan*, 386 Mass. 772, 438 N.E.2d 60 (1982); *People v. Gebarowski*, 47 Mich.App. 379, 209 N.W.2d 543 (1973); *Blydenburg v. David*, Mo., 413 S.W.2d 284 (1967); *State v. Hudes*, 128 N.J.Super. 589, 321 A.2d 275 (1974); *People v. Sweeney*, 55 Misc.2d 793, 286 N.Y.S.2d 506 (1968); *State v. Fogle*, 254 Or. 268, 459 P.2d 873 (1969); *Commonwealth v. Reynolds*, 256 Pa.Super. 259, 389 A.2d 1113 (1978); *Walton v. Roanoke*, 204 Va. 678, 133 S.E.2d 315 (1963) (blood test); *State v. Albright*, 98 Wis.2d 663, 298 N.W.2d 196 (Ct.App.1980).

 Two states—Oklahoma and Texas—formerly held that involuntary chemical tests for intoxication violated state constitutional provisions regarding self-incrimination. *See, e.g., Lorenz v. State*, Okla.Crim.App., 406 P.2d 278 (1965); *Apodaca v. State*, 140 Tex.Cr.R. 593, 146 S.W.2d 381 (1940). Significantly, those decisions have been overruled. *See State v. Thomason*, Okla.Crim. App., 538 P.2d 1080 (1975); *Olson v. State*, Tex. Crim.App., 484 S.W.2d 756 (1972). See also those cases cited in *Hansen v. Owens*, Utah, 619 P.2d 315, 319 (1980) (Stewart, J., dissenting).

is mandated by our decision in *Hansen v. Owens*, Utah, 619 P.2d 315 (1980).

As a threshold argument, American Fork City asserts that there was no "compulsion" in this case because the defendant was free to take the test or not, and he chose to take it (though had he chosen not to take the test he could have had his driver's license revoked, and the jury in any subsequent civil or criminal action could have drawn an unfavorable inference from evidence of his refusal; *see* U.C.A., 1953, § 41–6–44.10 (Supp.1981)).

 Neither party has provided the Court with any legal analysis of this question in its briefs or cited any helpful case law. We shall therefore assume for the purposes of this case that the "choice" offered by the implied consent statute is sufficient compulsion to invoke article I, section 12. A state need not resort to torture to "compel" evidence.

> The state might instead accept the refusal to answer but choose to impose a sanction rather than attempt to extract a response. The result is a far more dignified process, but one that is no less cruel. The imposition of harsh penalties in a gentlemanly manner can reflect as much inhumanity as the utilization of overt force. In fact, analytically both represent the same fundamental tactic of subjecting the suspect to the choice of responding or else.

M. Berger, *Taking the Fifth: The Supreme Court and the Privilege Against Self-Incrimination* 31 (1980). Historically, the compulsion against which the privilege was directed was not so much physical force but the risk of being found in contempt for refusing to answer or of having adverse inferences drawn from one's silence in court. We note with approval the following language from *People v. Thomas*, 46 N.Y.2d 100, 412 N.Y.S.2d 845, 849, 385 N.E.2d 584, 587 (1978):

> Compulsion need not of course be physical; it may as well be accomplished by the State's attaching to the alternative course of action a penalty, punishment or detriment for the imposition of

which no other justification exists and of which the defendant is therefore entitled to be free. If, to avoid that unwarranted threatened consequence, the defendant produces what is self-incriminating evidence, that evidence is fairly to be regarded as having been compelled and thus constitutionally inadmissible in a criminal proceeding against him.

The defendant in this case maintains that, having been compelled to take a breathalyzer test by the threat of the loss of his driver's license if he refused, he has been deprived of his rights under article I, section 12 of the Utah Constitution as construed by this Court in *Hansen v. Owens*, Utah, 619 P.2d 315 (1980).

In *Hansen*, the petitioner sought to enjoin enforcement of a lower court's order requiring him to furnish a handwriting sample for use in his criminal prosecution for forgery. This Court held that the order, which required the accused "to do the *affirmative act* of writing," violated the petitioner's rights under article I, section 12. *Id.* at 317 (emphasis added). However, the Court noted that the case "went beyond making observations ... of an accused's ... body, or ... substances obtained therefrom" and said that its decision was to be limited to its particular facts. *Id.* Therefore, in deciding whether to extend the "affirmative act" analysis of *Hansen* to breathalyzer tests, we must examine the underlying rationale for that decision.

 The Court in *Hansen* noted that the type of evidence sought would not be privileged under the United States Constitution's self-incrimination provision, U.S. Const. amend. V. *Hansen*, 619 P.2d at 316. The United States Supreme Court has held that the fifth amendment privilege against self-incrimination "protects an accused only from being compelled to *testify* against himself, or otherwise provide the State with evidence of a *testimonial* or *communicative* nature...." *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966) (footnote omitted; emphasis added). *See also South Da-*

*kota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). It does not prevent the state from obtaining real or physical evidence from an accused without his consent. The *Hansen* Court further noted, however, that the Utah Constitution gives expression to the privilege against self-incrimination in language that is different from that used in the fifth amendment. The fifth amendment says that no person can be compelled "to *be a witness* against himself," whereas article I, section 12 of the Utah Constitution says, "The accused shall not be compelled to *give evidence* against himself." (Emphasis added.) It is a cardinal rule of construction that constitutions should be construed in light of their framers' intent. The *Hansen* Court reasoned that, since the Utah Constitution used different words to express the privilege, its framers must have meant the provision "to mean something different and broader than" its federal counterpart. 619 P.2d at 317.

This argument has little support in history, and as Justice Frankfurter noted with regard to the privilege against self-incrimination, "[A] page of history is worth a volume of logic." *Ullmann v. United States*, 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956), (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921)). In 1776, the common-law privilege against self-incrimination was first elevated to the status of a constitutional right in section 8 of Virginia's Declaration of Rights, which, like the Utah Constitution, provided that a man could not "be compelled to give evidence against himself." L. Levy, *Origins of the Fifth Amendment: The Right Against Self-Incrimination* 405–06 (1968). "[T]here is no evidence that [the provision] was taken literally or regarded as anything but a sonorous declamation of the common-law right of long standing." *Id.* at 409. This provision became a model for other state constitutions, at least six of which were adopted before the federal Bill of Rights. *See id.* at 409, 412. By the time the Utah Constitution was adopted in 1895, half the states that recognized the privilege

expressed it in terms of giving "evidence." The constitutions of the remaining states, like the federal constitution, protected a person from being a "witness" or from "testifying" against himself. *See* 8 J. Wigmore, *Evidence* § 2252 at 319–23 (McNaughton rev. 1961).

It was generally accepted at the time that these differences in wording were insignificant. In 1892, the United States Supreme Court said:

> [T]he manifest purpose of the constitutional provisions, both of the States and of the United States, is to prohibit the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon the constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation; and that where the constitution [of a state] ... declares that the subject shall not be "compelled to accuse or furnish evidence against himself," such a provision should not have a different interpretation from that which belongs to constitutions ... which declare that no person shall be "compelled in any criminal case to be a witness against himself."
>
> ....
>
> ... [T]here is really, in spirit and principle, no distinction arising out of such differences of language.

*Counselman v. Hitchcock*, 142 U.S. 547, 584–86, 12 S.Ct. 195, 206–07, 35 L.Ed. 1110 (1892). We can presume that the framers of the Utah Constitution were familiar with the prevailing view of the significance of these differences in wording when they drafted that document. There is no indication whatsoever that their choice of one widely used expression of the privilege over another was meant to broaden the privilege as it existed at that time.

This conclusion is borne out by the proceedings of the Utah Constitutional Convention. The self-incrimination provision

of article I, section 12 was adopted without one word of debate. The comments of one delegate help explain this absence. In discussing the confrontation clause of article I, section 12, he explained:

> The provisions of this section [which included the self-incrimination clause] are substantially those in every constitution, I believe. They have received judicial interpretation and construction for many years....
>
> ... Why not leave [the section] as it is? Why not leave it within the ancient landmarks, so that every lawyer and every layman may know just what this does mean? Judicial decision after decision, all in one line, particularly have determined the meaning of this language as the committee have [sic] reported it here. Why should we stray away and put something in there that will tend to bring about and will doubtless bring about this confusion and conflict in interpretation?

1 *Official Report of Proceedings and Debates of the Convention: 1895* 307–08 (1898) (comments by Mr. Varian).

■ Thus, if any intent can be derived from the proceedings of Utah's Constitutional Convention, it is that the framers intended the privilege to have the same scope that it had under similar constitutional provisions, which was the scope it had at common law. History supports the conclusion, accepted by the vast majority of authorities, that the common-law privilege is limited to testimonial and communicative evidence only and not to evidence of a real or physical nature such as that obtained from a breathalyzer test. It is widely acknowledged that the common-law privilege against self-incrimination was aimed directly at the inquisitorial system of the English ecclesiastical courts, traces of which began to creep into the civil-law system at an early date. *See generally* L. Levy, *supra;* 8 J. Wigmore, *supra,* § 2250. Under this system, the accused could be required to take an oath to answer truthfully all questions directed to him. Thus, he was placed in the "cruel trilemma" of having to answer truthfully (which, depending on how skillfully the questions were framed, could incriminate him even if he were innocent of the offense), commit perjury, or remain silent and be found in contempt of court. *See Murphy v. Waterfront Commission,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964). The right against self-incrimination developed as a protection from such inquisitorial tactics. It provided only that a person could not be required to answer incriminating questions involuntarily.[2] *See* L. Levy, *supra,* at 264, 355; F. Inbau, *Self-Incrimination: What Can an Accused Person Be Compelled to Do?* at 5 (1950) (the privilege was meant "[t]o put an end to the practice of extracting *incriminating statements* from accused persons"). *See generally Hansen,* 619 P.2d at 317–21 (Stewart, J., dissenting).

■ Of course, the scope of constitutional guarantees is not limited by their historical roots. In determining the proper scope of the privilege, we must also deal with underlying policy considerations that militate for or against an expansive construction. The primary basis of the privilege is the respect of government for its citizens. "[T]o respect the inviolability of the human personality, our accusatory system of criminal justice demands that government seeking to punish an individual produce the evidence against him by its own independent labors...." *Miranda v. Arizona,*

---

**2.** The United States Supreme Court has said that the privilege requires the government to produce the evidence against a person "by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Obviously, requiring an accused to submit to a breathalyzer examination could be viewed as compelling incriminating evidence from the ac-cused's own mouth. However, the Supreme Court meant this language metaphorically, as shown by the sentence immediately following, "In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will,'" *id.* (citation omitted), and by its holding in *Schmerber,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908, that the privilege protects only testimonial evidence.

384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966). Balanced against this is the duty of government to protect its citizens. The state has a substantial interest in effective law enforcement and a legitimate need for the type of information provided by a breathalyzer test. Chemical tests for intoxication are at the heart of a state's efforts to deal with the serious and substantial menace presented by drunk drivers. What the United States Supreme Court has said with regard to blood tests for intoxication applies with equal force to less "intrusive" breathlyzer tests:

> As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test ..., must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body ... is far outweighed by the value of its deterrent effect....

*Breithaupt v. Abram,* 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957). Our task is to find the resolution that will best give effect to these conflicting interests. "In the final analysis, the argument boils down to the question of where the line limiting state power should be drawn." M. Berger, *supra,* at 40. In drawing that line here, we must examine what purpose would be served by continued adherence to the affirmative act standard used in *Hansen,* 619 P.2d at 317.

The affirmative act standard, as we interpret it, means that an accused may not be compelled to actively produce evidence against himself or to perform any affirmative act that will produce or create such evidence. Perhaps the best justification for the affirmative act standard is that it removes any incentive for the state to use

cruelty in procuring evidence from the accused. As one commentator notes: "The whip would be just as effective in forcing the accused to place his foot in a shoe track [an affirmative act] as in forcing him to give up testimonial evidence." Note, *The Georgia Right Against Self-Incrimination: Historical Anomaly or Vanguard of Justice?* 15 Ga.L.Rev. 1104, 1115 (1981). However, the Utah Constitution's due process provision, Utah Const. art. I, § 7, and its prohibition against unlawful searches and seizures, *id.* article I, § 14, may be better suited than the self-incrimination clause for dealing with such governmental excesses.

The affirmative act standard also avoids the basic unfairness of forcing a witness to "choose among the three horns of the triceratops—harmful disclosure, contempt [and] perjury." 8 J. Wigmore, *supra,* § 2251, at 316 (emphasis omitted). However, the standard is overinclusive in this regard. Not every affirmative act that the state might compel presents the accused with the temptation of perjury. Defendant Crosgrove, for example, could not have falsified his blood alcohol content.

In contradistinction to the modest policy justifications for the affirmative act standard, its likely consequences are excessively detrimental to the administration of justice. "What constitutes affirmative and nonaffirmative acts is often merely a question of semantics providing enforcement officers very little guidance on which to base their decisions." Note, *supra,* at 1121. Furthermore, the standard can lead to irrational distinctions and incongruous results. For example, under the affirmative act standard, an accused could not be compelled to place his foot in a footprint near the scene of the crime. *See Day v. State,* 63 Ga. 667 (1879). Yet an officer could forcibly remove the accused's shoe and place it in the track. *See Myers v. State,* 97 Ga. 76, 25 S.E. 252 (1895). Similarly, an accused could not be compelled to provide a voice exemplar, to be matched against a voice graph from a recording

made at the time of the crime, but he could be fingerprinted against his will. Yet each of these examples involves the comparison of a physical characteristic of the accused with evidence already in the state's possession. Under the affirmative act standard,

> an accused may not be required to place his hand in his pocket to produce a pistol, but an officer may take a pistol from the accused's person. An accused may not be compelled to stand up in court to display his amputated leg for identification, but he may be required to stand passively in a lineup.

Note, *supra*, at 1110 (citations omitted). The distinction might also mean that the state could obtain blood samples from an unconscious person, but could not get a breath sample from a conscious person, even though the latter is far less intrusive upon a person's privacy and bodily integrity. In short, the affirmative act standard requires the state to make overly fine distinctions that may not further significantly the policies of the privilege. (The difficulty of making such distinctions is illustrated by our decision in *Hansen* itself, which failed to distinguish adequately an earlier decision by this Court that held that the privilege against self-incrimination does not apply to appearances in and speaking at a lineup—arguably affirmative acts. *State v. Spencer*, 28 Utah 2d 12, 497 P.2d 636 (1972).)

Significantly, Georgia, the only jurisdiction to follow the affirmative act standard, has shown signs of retreating from that standard in recent years. *See, e.g., English v. State*, 234 Ga. 602, 604, 216 S.E.2d 851, 853 (1975) (traces of substances removed from the accused's hands were "non-testimonial evidence" and therefore not privileged); *Fouts v. State*, 240 Ga. 39, 44, 239 S.E.2d 366, 370 (1977) (hair samples taken when defendant was asked to brush his hair to provide such samples for identification were admissible); *see generally* Note, *supra*, at 1109–13.

We are persuaded that the affirmative act standard suggested in *Hansen* has little to recommend itself. We therefore conclude that we can best give effect to the substantial state interests involved and at the same time adequately protect the rights of the individual by a construction, historically sound, of article I, section 12 that limits its scope to those situations where the state seeks evidence of a testimonial or communicative nature. Under this standard, the right of the individual not to reveal his thoughts in the face of accusations by the state—the most fundamental right sought to be protected by the privilege against self-incrimination—remains inviolate. We therefore hold that the defendant's rights under the Utah Constitution's self-incrimination provision were not violated when, after his arrest, he was required to submit to a breathalyzer test under the threat of losing his driver's license. Because it is inconsistent with the result we reach today, *Hansen v. Owens*, Utah, 619 P.2d 315 (1980), is hereby overruled.

Affirmed.

STEWART, Justice (Concurring):

I concur in the Court's judgment for the reasons stated in the majority opinion and for the reasons stated in my dissenting opinion in *Hansen v. Owens*, Utah, 619 P.2d 315, 317 (1980). The construction that a majority of the Court in *Hansen* placed upon Article I, Section 12 of the Utah Constitution was justified neither by precedent nor by the meaning that had historically been placed on that provision.

In construing Article I, Section 12 to be essentially a testimonial privilege, as the Court now does, it should be recognized that the privilege extends beyond the compulsion of only oral testimony. Article I, Section 12 establishes a relationship in a criminal proceeding between the accused and the State that prevents the State from extracting confessions or admissions by whatever means it may devise. In short, the State is precluded from requiring an individual to communicate any of his or her thoughts, whether oral or written, that might be incriminating. Thus, the constitutional provision also protects against the

compulsory production of private papers that might be incriminating. *First Federal Savings and Loan Ass'n v. Schamanek,* Utah, 684 P.2d 1257 (1984). Fundamentally, the privilege stakes out an area of personal privacy where the State simply may not enter. In essence, the privilege accords sovereignty to the individual over his thoughts and personal papers.

In my dissent in *Hansen v. Owens,* I stated that the privilege against self-incrimination applies to both "testimonial and communicative evidence." 619 P.2d at 319. The landmark federal case on this subject was decided in the previous century by the United States Supreme Court in *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886), where the Court in discussing the Fourth and Fifth Amendments to the United States Constitution stated:

> The principles laid down in this opinion affect the very essence of constitutional liberty and security.... [T]hey apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other.

The Court also stated, "And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." *Id.* at 631–32, 6 S.Ct. at 532–33. The Court further explained, "[W]e have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. We think it is within the clear intent and meaning of those terms." *Id.* at 633, 6 S.Ct. at 534. Accordingly, the Court held that "no person shall be compelled in any criminal case to be a witness against himself; and we are further of [the] opinion that a compulsory production of the private books and papers of the owner of [the] goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the Fifth Amendment to the Constitution, and is the equivalent of a search and seizure—and an unreasonable search and seizure—within the meaning of the Fourth Amendment." *Id.* at 634–35, 6 S.Ct. at 534–35.

Whether the privilege also acts to prevent intrusion into the body by unnatural means, at least beyond such innocuous intrusions as the insertion of a sterile needle by a qualified technician for the taking of a blood sample, need not now be decided.

Finally, I am constrained to disagree with the majority's analytical approach in deciding when the privilege is applicable. The majority purports to balance the principles underlying the privilege against self-incrimination against the State's interest in obtaining information it deems necessary to prosecute for driving while under the influence. Judicial balancing of the constitutional right against the need for the evidence places the very foundation of the constitutional right upon the shifting sands. Balancing of the interests concerned is not only a threat to the integrity of the constitutional right itself, but is also unnecessary. It is unnecessary because

the framers of our Constitution have already made the choice for us; there is no balancing to be done. The privilege of a person not to give evidence against himself under Article I, Section 12 is absolute (absent a waiver or the grant of immunity), and our duty is fulfilled when we say as much. I submit that the majority's analysis lends itself to being used to erode the right that the framers of our Constitution thought essential to a civilized society.

HOWE, Justice (concurring):

I concur but do so on grounds different than those relied upon in the majority opinion. I concur in affirming the conviction of the defendant on the ground that there is no evidence before us that his submission to the breathalyzer test was involuntary. He has not provided us with a transcript of the testimony at the trial, and we are left with only the clerk's notes as to the testimony of the witnesses. The clerk noted that the arresting officer testified that the defendant at first refused to take the test, but after he was allowed to telephone his attorney, he consented to take the test. Nothing further appears to explain why the defendant changed his mind. It is entirely possible that he and his attorney determined that he was not intoxicated and that he could pass the test. There is no evidence, not even the defendant's testimony, that he felt compelled to submit to the breathalyzer test in order to escape the consequence of losing his license if he refused.

Article I, section 12 of the Utah Constitution provides a privilege from being compelled to give evidence against oneself. If one chooses to provide such evidence, the privilege is waived, and he cannot afterward complain.

ZIMMERMAN, Justice (concurring):

I agree that requiring an individual charged with driving while intoxicated to submit to a breath test does not violate article I, section 12 of the Utah Constitution. I also agree with Justice Howe that we should not reach out unnecessarily to overrule *Hansen v. Owens*, Utah, 619 P.2d 315 (1980). However, I conclude that as a practical matter, requiring a driver to submit to a breathalyzer under threat of losing his license for a year certainly amounts to using compulsion to secure the test, whatever the legislative rubric used to justify the compulsion.[1] Having decided that the test was compelled, we must inevitably rule upon the continued vitality of *Hansen* because we must then determine whether defendant has been "compelled to give evidence against himself" in violation of his article I, section 12 right.

In my view, *Hansen* would require a ruling that the breathalyzer test results were unconstitutionally obtained. Upon examination, I find that the interpretation given article I, section 12 in *Hansen* is inconsistent with the historical meaning of the words used in our constitutional provision and that the affirmative act standard adopted by *Hansen* does not provide a practical framework for administering our privilege against self-incrimination. Therefore, I reluctantly agree that *Hansen* must be overruled. Our privilege is testimonial only.

Although I find article I, section 12 to be inapplicable, the legality of compelling an individual to submit to tests or procedures that require a trespass upon or an invasion of the person, such as breath tests, blood tests, urine tests, fingernail scrapings, and hair samples, should be analyzed under article I, section 14 of the Utah Constitution, which protects individuals from unreasonable searches and seizures. *See Cupp v. Murphy*, 412 U.S. 291, 294–96, 93 S.Ct. 2000, 2003–04, 36 L.Ed.2d 900 (1973); *People v. Butor*, N.Y., 75 Misc.2d 558, 348 N.Y.S.2d 89, 94 (1973); *McClain v. State*, Ind., 410 N.E.2d 1297, 1300–01 (1980); *cf. State v. Easthope*, Utah, 668 P.2d 528, 531–32 (1983). However, because defend-

---

1. Our candid recognition of the practical choices that confront a driver who is asked to take the test in no way impugns the validity of the implied consent statute, which requires the driver to take such a test. U.C.A., 1953, § 41–6–44.10 (1982 ed.).

ant did not raise this point, I do not address it here. Nor do I suggest that such an analysis would necessarily produce a different result.

HALL, Chief Justice (concurring and dissenting):

I join the Court in holding that the implied consent statute[1] does not compel a driver to give evidence against himself in violation of article I, section 12 of the Constitution of Utah. However, I do not join the Court in overturning *Hansen v. Owens,*[2] because I find no inconsistency in the rule of law laid down therein.

The decision of the Court in *Hansen v. Owens* was expressly limited to the particular facts of that case,[3] yet the majority makes no effort to draw the factual distinction that plainly exists.

In *Hansen v. Owens*, the defendant had *refused* to perform the affirmative act necessary to provide a handwriting exemplar, and the Court was called upon to compel the defendant to furnish one. That factual scenario is completely foreign to that of the instant case wherein the defendant *voluntarily submitted* to the breathalyzer test. He simply exercised the *choice* afforded him by the implied consent statute and *opted* to submit to the test rather than face the possible loss of his license to operate a motor vehicle.

The implied consent statute does not *compel* a driver to do *anything,* and it is not vulnerable to constitutional attack because it contains no provisions that cannot reasonably be justified under the police power exercised in the best interest of the public welfare.

If *Hansen v. Owens* is no longer to be the law, are the courts then duty-bound to *compel* an accused to provide a handwriting exemplar absolutely against his will? If so, as a matter of practicality, how is this to be accomplished? By brute force? I should think not! By exercise of the contempt power? Possibly, but such may prove ineffective since an accused is likely to face contempt rather than run the risk of conviction for a greater felony offense.

It would be far better, as was pointed out in *Hansen v. Owens,* to obtain a sample of the accused's handwriting from some other source.[4] To do so would preserve the time-honored doctrines of presumption of innocence and burden of proof.

The Court has this day reached a long way to overturn *Hansen v. Owens* and in so doing has done violence to the doctrine of *stare decisis.* Moreover, I remain unpersuaded that any legitimate purpose has been accomplished.